1
2
3
4
5
6
7
8                         UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   FOOTHILL CHURCH, CALVARY                No.  2:15-cv-02165-KJM-EFB
     CHAPEL CHINO HILLS, and
12   SHEPHERD OF THE HILLS CHURCH,

13                 Plaintiffs,               ORDER

14          v.

15   MICHELLE ROUILLARD, in her official
     capacity as Director of the California
16   Department of Managed Health Care,

17                 Defendant.

18

19                This action arises from letters issued by the California Department of Managed

20   Health Care ("DMHC") to seven private health insurers ("insurers" or "Plans") on August 22,

21   2014, which required them to remove any limitations on or exclusions of abortion services from

22   the health care coverage they offer.  Compl. Ex. 1, ECF No. 1-1.  Plaintiffs Foothill Church,

23   Calvary Chapel Chino Hills, and Shepherd of the Hills Church ("plaintiffs" or "Churches"), three

24   churches who allegedly offer their employees DMHC-regulated health coverage through these

25   insurers, filed this action against defendant Michelle Rouillard ("defendant" or "Director"),

26   Director of the DMHC, alleging the letters violate their constitutional rights under the First and

27   Fourteenth Amendments.  This matter is before the court on defendant's motion to dismiss the

28   complaint.  ECF No. 21.  Plaintiffs oppose the motion.  ECF No. 26.  The court held a hearing on

                                               1

1    May 6, 2016, at which Jeremiah Galus, Erik Stanley, and David Hacker appeared for plaintiffs,

2    and Joshua Sondheimer and Hadara Stanton appeared for defendant.  As explained below, the

3    court GRANTS defendant's motion.

4    I.        STATUTORY AND REGULATORY BACKGROUND

5             A.        State Regulatory Framework for Health Care Industry

6                       In California, the DMHC and the California Department of Insurance ("CDI")

7    oversee regulation of the health care industry.  The DMHC regulates "health care service plans"

8    under the Knox-Keene Health Care Service Plan Act of 1975 ("Knox-Keene Act" or "Act"), Cal.

9    Health & Safety Code § 1340 *et seq.*, including by approving or disapproving language submitted

10   in evidence of coverage filings.  The Knox-Keene Act defines "health care service plans" as

11   "[a]ny person who undertakes to arrange for the provision of health care services to subscribers or

12   enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a

13   prepaid or periodic charge paid by or on behalf of the subscribers or enrollees."  Cal. Health &

14   Safety Code § 1345(f)(1).  Health maintenance organizations ("HMOs") and other structured

15   managed care organizations ("MCOs") are "health care service plans" under this definition.

16   *Rea v. Blue Shield of Cal.*, 226 Cal. App. 4th 1209, 1215 (2014).

17                      The CDI, on the other hand, regulates traditional health insurance companies under

18   the California Insurance Code.  Cal. Ins. Code §§ 740–742.1; *see Rea*, 226 Cal. App. 4th at 1215.

19   The Knox-Keene Act does not generally govern entities regulated by the CDI, *see* Cal. Health &

20   Safety Code §§ 1343(e)(1) & 1349, and sections 740 to 742.1 of the Insurance Code, in turn, do

21   not apply to health care service plans, *see* Cal. Ins. Code §§ 740(g) & 742(b).

22                      In addition, because the federal Employee Retirement Income Security Act of

23   1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, preempts most state health plan regulations, self-

24   funded health plans subject to ERISA need not comply with most state health coverage

25   requirements.  *See District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130 (1992);

26   *FMC Corp. v. Holliday*, 498 U.S. 52, 61 (1990).

27

28

                                                        2

B.      The Knox-Keene Act

The Knox-Keene Act requires a person to secure a license from the Director of the DMHC before offering a health care service plan.  Cal. Health & Safety Code § 1349.  One requirement for licensure is that "[a] health care service plan contract [must] provide to subscribers and enrollees all of the basic health care services included in subdivision (b) of Section 1345."  Cal. Health & Safety Code § 1367(i).  Section 1345(b) lists the following as "basic health care services":

(1) Physician services, including consultation and referral.

(2) Hospital inpatient services and ambulatory care services.

(3) Diagnostic laboratory and diagnostic and therapeutic radiologic services.

(4) Home health services.

(5) Preventive health services.

(6) Emergency health care services, including ambulance and ambulance transport services and out-of-area coverage.  "Basic health care services" includes ambulance and ambulance transport services provided through the "911" emergency response system.

(7) Hospice care pursuant to Section 1368.2.

*Id.* § 1345(b).  Section 1367(i) continues that "[t]he director shall by rule define the scope of each basic health care service that health care service plans are required to provide as a minimum for licensure" under the Act.  *Id.* § 1367(i).  Based on this authority, the Director promulgated regulations defining the scope of "[t]he basic health care services required to be provided by a health care service plan to its enrollees . . . where medically necessary."  Cal. Code Regs. tit. 28, § 1300.67.  The regulations define "physician services" to include services "provided by physicians licensed to practice medicine or osteopathy," *id.* § 1300.67(a), and define "preventive health services" to include "a variety of voluntary family planning services," *id.* § 1300.67(f)(2).

The Knox-Keene Act provides for a number of categorical and individualized exemptions, including the following examples.  First, "[a] plan directly operated by a bona fide public or private institution of higher learning" and the California Small Group Reinsurance Fund are each exempt from regulation under the Act.  Cal. Health & Safety Code § 1343(e).  Second,

3

1   the Act gives the Director the authority, "for good cause, by rule or order [to] exempt a plan

2   contract or any class of plan contracts" from the requirement of providing all of the basic health

3   care services included in section 1345(b). *Id.* § 1367(i).  The Act also gives the Director broad

4   authority to exempt any class of persons or plan contracts from the regulations of the Act or to

5   waive any requirement of any rule or form if the Director finds exemption or waiver to be in the

6   public interest and not detrimental to the protection of the subscribers, enrollees, or persons

7   regulated under the Act. *Id.* §§ 1343(b), 1344(a).  Third, the Act offers religious employers

8   exemptions from providing coverage for "FDA-approved contraceptive methods that are contrary

9   to [their] religious tenets," *id.* § 1367.25(c), or coverage for "forms of treatment of infertility in a

10   manner inconsistent with [their] religious and ethical principles," *id.* § 1374.55(e).

11       C.      Reproductive Rights Under California Law

12             In 1972, California voters amended the state constitution to include a right to

13   privacy among the inalienable rights protected by Article I, section 1.  *See Chico Feminist*

14   *Women's Health Ctr. v. Butte Glenn Med. Soc.*, 557 F. Supp. 1190, 1201 (E.D. Cal. 1983) (citing

15   *White v. Davis*, 13 Cal. 3d 757, 773–74 (1975)).  The California Supreme Court has interpreted

16   Article I, section 1 as providing that "all women in this state—rich and poor alike—possess a

17   fundamental constitutional right to choose whether or not to bear a child." *Comm. To Defend*

18   *Reprod. Rights v. Myers*, 29 Cal. 3d 252, 262 (1981).

19             In addition to these constitutional protections, the Reproductive Privacy Act of

20   2002 declares, "[I]t is the public policy of the State of California that . . . [e]very woman has the

21   fundamental right to choose to bear a child or to choose and to obtain an abortion . . . ." Cal.

22   Health & Safety Code § 123462(b).  It prohibits the state from "deny[ing] or interfer[ing] with a

23   woman's right to choose or obtain an abortion prior to viability of the fetus, or when the abortion

24   is necessary to protect the life or health of the woman." *Id.* § 123466.

25       D.      The Federal Patient Protection and Affordable Care Act

26             The federal Patient Protection and Affordable Care Act of 2010 ("ACA"),

27   124 Stat. 119, "generally requires employers with 50 or more full-time employees to offer 'a

28   group health plan or group health insurance coverage' that provides 'minimum essential

4

coverage.'"  *Burwell v. Hobby Lobby Stores, Inc.*, ___ U.S. ___, 134 S. Ct. 2751, 2762 (2014)

(quoting 26 U.S.C. §§ 4980H(a), 4980H(c)(2), 5000A(f)(2)).  If any covered employer stops

providing health insurance altogether and at least one full-time employee enrolls in a health plan

and qualifies for a subsidy on one of the government-run ACA exchanges, the employee must pay

$2,000 per year for each of its full-time employees.  *Id.* (citing 26 U.S.C. §§ 4980(H)(a), (c)(1)).

II.      FACTUAL AND PROCEDURAL BACKGROUND

On October 16, 2015, plaintiffs filed a complaint, which makes the following

allegations.  Compl., ECF No. 1.  On August 22, 2014, the Director of the DMHC sent letters to

seven private health insurers stating that the DMHC had reviewed their contracts and the relevant

legal authorities and "concluded that it erroneously approved or did not object to" language in

some previous evidence of coverage ("EOC") filings that may discriminate against women by

limiting or excluding coverage for termination of pregnancies.  Compl. ¶¶ 2, 27; Compl. Ex. 1

at 1.  Private insurers had previously submitted EOC filings to the DMHC notifying defendant of

benefit plan options that excluded coverage for voluntary and elective abortions, and defendant

and the DMHC had not objected.  Compl. ¶¶ 45–47.

The letters continued:

> The purpose of this letter is to remind plans that the [Knox-Keene
> Act] requires the provision of basic health care services and the
> California Constitution prohibits health plans from discriminating
> against women who choose to terminate a pregnancy.  Thus, all
> health plans must treat maternity services and legal abortion
> neutrally.

Compl. Ex. 1 at 1.

To ensure compliance with California law, the letters required the recipient private

health insurers to review all current health plan documents to ensure compliance, to amend

current health plan documents to remove discriminatory coverage exclusions and limitations, and

to file any revised relevant health plan documents with the DMHC, all within ninety days of the

date of the letter.  *Id.* at 2.  Plaintiffs refer to these requirements generally as "the Mandate."  *See*

Compl. ¶ 2.  The letters provided examples of discriminatory limitations or exclusions, such as

excluding coverage for "voluntary" or "elective" abortions, and stated the insurer "may,

1    consistent with the law, omit any mention of coverage for abortion services in health plan

2    documents, as abortion is a basic health care service."  Compl. Ex. 1 at 2.  For support, the letters

3    cited the authorities described above, specifically, Article 1, section 1 of the California

4    Constitution, California Health and Safety Code section 1340 *et seq.*, California Health and

5    Safety Code section 123460 *et seq.*, and implementing regulations.  *Id.*  Each letter noted,

6    "Consistent with 42 U.S.C. § 18054(a)(6), this letter shall not apply to a Multi-State Plan."  *Id.*

7    at 1 n.2.  Section 18054(a)(6) provides specifically that "[i]n entering into contracts under this

8    subsection, the Director shall ensure that with respect to multi-State qualified health plans offered

9    in an Exchange, there is at least one such plan that does not provide coverage of [abortion

10   services]."  The DMHC also published copies of the letters on its website.  Compl. ¶ 27; Compl.

11   Ex. 2, ECF No. 1-2.

12           Plaintiffs are three non-profit Christian churches located in Southern California.

13   Compl. ¶¶ 13–15.  Each plaintiff has more than fifty full-time employees and must, therefore,

14   provide health coverage for its employees under the ACA.  *Id.* ¶¶ 59–61.  Foothill Church offers

15   health insurance plans to its employees through Kaiser Permanente and Blue Shield, with the plan

16   year beginning and ending annually on or about July 1.  *Id.* ¶ 13.  Calvary Chapel Chino Hills

17   offers health insurance plans to its employees through Kaiser Permanente, Aetna, and Anthem

18   Blue Cross, with the plan year beginning and ending annually on or about November 30.  *Id.* ¶ 14.

19   Shepherd of the Hills Church offers health insurance plans to its employees through Anthem Blue

20   Cross and Kaiser Permanente, with the plan year beginning and ending annually on or about

21   December 1.  *Id.* ¶ 15.  Plaintiffs' insurers each received a letter from the DMHC as described

22   above.  *See* Compl. Ex. 1.

23           Plaintiffs all hold what they describe as "historic and orthodox" Christian

24   teachings on the sanctity of human life.  Compl. ¶ 17.  They "believe and teach that abortion ends

25   a human life and is a grave sin," and they "believe that participation in, facilitation of, or payment

26   for abortion is inconsistent with the dignity conferred by God on creatures made in His image."

27   *Id.* ¶¶ 20–21.  "Consistent with their Christian beliefs and principles, Plaintiffs also promote the

28   physical, emotional, and spiritual well-being of their employees through the provision of

6

generous health insurance as a benefit of employment." *Id.* ¶ 22.  In furtherance of these beliefs and principles, plaintiffs consulted with their insurance brokers and/or insurers to provide employee group health plans that do not pay for abortions. *Id.* ¶¶ 23–24.  However, plaintiffs' insurance brokers and/or insurers have informed them that the DMHC's letters require their group health insurance plans to cover abortions, including voluntary and elective ones. *Id.* ¶ 25.

This action followed.  The complaint alleges the DMHC's letters violate plaintiffs' rights under the Free Exercise, Establishment, Free Speech, and Equal Protection clauses of the U.S. Constitution.  *See id.* ¶¶ 104, 114, 119, 126.  In support of the Free Exercise and Establishment clause claims, the complaint alleges defendant issued the letters after learning that two Catholic universities unrelated to plaintiffs eliminated elective abortion coverage from their health care plans. *Id.* ¶ 48.  It further alleges defendant had knowledge her letters would coerce religious employers and churches, like plaintiffs, to violate their sincerely held religious beliefs, *id.* ¶ 7, and in fact designed the content of the letters "to make it impossible for Plaintiffs to comply with their religious beliefs," *id.* ¶ 62.  With respect to the Free Speech claim, the complaint alleges the letters infringe plaintiffs' rights by requiring plaintiffs to purchase group health plans that provide coverage for abortions, and, as a result, to fund abortions through their employee health plans. *Id.* ¶¶ 116–17.  Finally, in support of the Equal Protection claim, the complaint alleges the letters treat plaintiffs differently than similarly situated persons and businesses "in that there are categorical and individualized exemptions to the Knox-Keene Act and the [letters'] requirements." *Id.* ¶ 123.  In addition to the exemptions discussed above, the complaint alleges the letters do not apply to health benefit plans offered by the California Public Employees' Retirement System (CalPERS) to active and retired state and local government employees. *Id.* ¶ 52 ("CalPERS continued to offer health benefit plans excluding coverage for elective abortions after Defendant issued the Mandate.").[1]

---

[1] Defendants request judicial notice of excerpts from three CalPERS PPO plans, which are self-funded and therefore outside the scope of the Director's regulatory authority. Def.'s Req. Jud. Notice, ECF No. 22.  However, evidence that "[s]ome" CalPERS plans are self-funded, ECF No. 21 at 14 n.5, does not disprove plaintiffs' allegation, which the court accepts as true at this stage.

1    On January 12, 2016, defendant moved to dismiss the complaint under Federal

2  Rules of Civil Procedure 12(b)(1) and 12(b)(6).  ECF No. 21 ("Mot.").  Plaintiffs opposed the

3  motion, ECF No. 26 ("Opp'n"), and defendant replied, ECF No. 30 ("Reply").  At hearing,

4  plaintiffs clarified they are challenging only the letters and the DMHC's enforcement of the

5  Knox-Keene Act; they are not bringing a facial constitutional challenge against the underlying

6  state laws.

7  III.    LEGAL STANDARDS

8    A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests the

9  court's subject matter jurisdiction.  *See, e.g.*, *Savage v. Glendale Union High Sch.*, 343 F.3d 1036,

10  1039–40 (9th Cir. 2003).  When a party moves to dismiss for lack of subject matter jurisdiction,

11  "the plaintiff bears the burden of demonstrating that the court has jurisdiction."  *Boardman v.*

12  *Shulman*, No. 12-00639, 2012 WL 6088309, at *2 (E.D. Cal. Dec. 6, 2012), *aff'd sub nom.*

13  *Boardman v. C.I.R.*, 597 F. App'x 413 (9th Cir. 2015).  If a plaintiff lacks standing, the court

14  lacks subject matter jurisdiction under Article III of the U.S. Constitution.  *Cetacean Cmty. v.*

15  *Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).

16    Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to

17  dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ.

18  P. 12(b)(6).  The motion may be granted only if the complaint "lacks a cognizable legal theory or

19  sufficient facts to support a cognizable legal theory."  *Hartmann v. Cal. Dep't of Corr. & Rehab.*,

20  707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted).

21    Although a complaint need contain only "a short and plain statement of the claim

22  showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to survive a motion

23  to dismiss, this short and plain statement "must contain sufficient factual matter . . . to 'state a

24  claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

25  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A complaint must include something

26  more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or "'labels and

27  conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Id.* (quoting

28  *Twombly*, 550 U.S. at 555).  Determining whether a complaint will survive a motion to dismiss

1   for failure to state a claim is a "context-specific task that requires the reviewing court to draw on

2   its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  Ultimately, the inquiry

3   focuses on the interplay between the factual allegations of the complaint and the dispositive

4   issues of law in the action.  *See Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

5           In making this context-specific evaluation, this court must construe the complaint

6   in the light most favorable to the plaintiff and accept its factual allegations as true.  *Erickson v.*

7   *Pardus*, 551 U.S. 89, 93–94 (2007).  This rule does not apply to "a legal conclusion couched as a

8   factual allegation," *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286

9   (1986)), "allegations that contradict matters properly subject to judicial notice," *Sprewell v.*

10  *Golden State Warriors*, 266 F.3d 979, 988–89 (9th Cir. 2001), or material attached to or

11  incorporated by reference into the complaint, *see id.*  A court's consideration of documents

12  attached to a complaint, documents incorporated by reference in the complaint, or matters of

13  judicial notice will not convert a motion to dismiss into a motion for summary judgment.  *United*

14  *States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003); *Parks Sch. of Bus. v. Symington*, 51 F.3d

15  1480, 1484 (9th Cir. 1995); *cf. Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th

16  Cir. 2002) (noting that even though court may look beyond pleadings on motion to dismiss,

17  generally court is limited to face of the complaint on 12(b)(6) motion).

18  IV.    DISCUSSION

19         A.    Standing

20              To have Article III standing, a plaintiff must show that

21              (1) it has suffered an 'injury in fact' that is (a) concrete and
                particularized and (b) actual or imminent, not conjectural or
22              hypothetical; (2) the injury is fairly traceable to the challenged
                action of the defendant; and (3) it is likely, as opposed to merely
23              speculative, that the injury will be redressed by a favorable
                decision.
24

25  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

26  "[E]ach element must be supported in the same way as any other matter on which the plaintiff

27  bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive

28  stages of the litigation."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  At this initial stage

1  of litigation, it is enough for a plaintiff to allege and not prove these three elements, "for on a

2  motion to dismiss we presum[e] that general allegations embrace those specific facts that are

3  necessary to support the claim." *Id.* (internal quotation marks and citation omitted).  However,

4  "when the plaintiff is not [itself] the object of the government action or inaction [it] challenges,

5  standing . . . is ordinarily substantially more difficult to establish." *Id.* at 562 (citations and

6  internal quotation marks omitted).

7              1.    <u>Injury in Fact</u>

8          With respect to the injury-in-fact requirement, plaintiffs allege

9        that their sincerely held religious beliefs prevent them from paying
   for abortion coverage in their health care plans, yet the Mandate
10  forces them to do so, *see, e.g.*, Compl. ¶¶ 17–21, 23, 25, 41, 83; that
   the Mandate has prevented them from obtaining a health insurance
11  plan that excludes coverage for abortions consistent with their
   religious beliefs, *see id.* ¶¶ 25, 43; that they cannot avoid the
12  Mandate without subjecting themselves to significant financial
   consequences, *see id.* ¶¶ 6, 64, 85, 98; and that the uncertainty
13  created by the Mandate inhibits their ability to recruit and retain
   employees and places them at a competitive disadvantage, *see id.*
14  ¶¶ 69, 99–101.

15  Opp'n at 4.  These allegations reviewed in the opposition, which the court accepts as true at this

16  stage, are sufficient to demonstrate an injury that is concrete, particularized, and actual or

17  imminent, as explained below.

18          "For an injury to be particularized, it must affect the plaintiff in a personal and

19  individual way." *Spokeo, Inc. v. Robins*, 578 U.S. __, 136 S. Ct. 1540, 1548 (2016) (citation and

20  internal quotation marks omitted).  Plaintiffs' allegations here show they have been personally

21  harmed as purchasers of the affected plans.  Plaintiffs' interests in the letters are personal and

22  individualized.

23          In addition to being particularized, an injury in fact must be "concrete." *Id.*  A

24  "concrete" harm is "real" and actually exists, but an intangible injury may nevertheless satisfy the

25  concreteness requirement in certain circumstances.  *Id.* at 1548–49 (providing, as an example,

26  *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (free speech)); *see also Council of Ins.*

27  *Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 931 (9th Cir. 2008) ("Impairments to

28  constitutional rights are generally deemed adequate to support a finding of 'injury' for purposes

1   of standing." (citation omitted)).  Plaintiffs have pled a concrete, real harm, because they allege

2   the coverage requirement in the letters has prevented them from providing health insurance to

3   their employees in a way that is consistent with their religious beliefs.  Compl. ¶¶ 17–21, 23, 41,

4   43; *see also Skyline Wesleyan Church v. Cal. Dep't of Managed Healthcare*, No. 16-501 (S.D.

5   Cal. June 20, 2016), ECF No. 36-1 at 9 (finding similar allegations establish standing in action

6   challenging the same DMHC letters).[2]  They allege the letters violate their constitutional rights

7   under the First and Fourteenth Amendments.  Compl. ¶¶ 104, 114, 119, 126; *see Council of Ins.*

8   *Agents & Brokers*, 522 F.3d at 931.  Plaintiffs have satisfied the injury-in-fact requirement of

9   Article III standing.

10                  2.      Causation

11              In addition, there is a direct causal link between plaintiffs' alleged injury and the

12  Director's letters.  The complaint alleges plaintiffs' private health insurers previously offered

13  group health insurance plans to churches and religious employers excluding coverage for

14  abortions, Compl. ¶ 45, and defendant and the DMHC did not previously object to such

15  exclusions before defendant issued the letters, *id.* ¶ 47.  The complaint alleges, as a result of the

16  letters, the private health insurers stopped offering plans excluding coverage for abortions.  *Id.*

17  ¶¶ 25, 43, 45.  Although defendant argues plaintiffs' injury is caused by state law, not the

18  Director, the complaint alleges the Director and the DMHC did not interpret or enforce state law

19  as requiring group health insurance plans to cover elective and voluntary abortions before the

20  Director issued the letters.  Moreover, as plaintiffs correctly note, a plaintiff "need not eliminate

21  any other contributing causes to establish its standing."  Opp'n at 7 (quoting *Barnum Timber Co.*

22  *v. U.S. Envtl. Prot. Agency*, 633 F.3d 894, 901 (9th Cir. 2011)).  Here, the connection between

23  plaintiffs' alleged injury and the Director's letters is not tenuous or abstract; the injuries can be

24

25

26          [2] Plaintiffs cited this case in a Notice of Supplemental Authority, which plaintiffs filed
     after hearing without leave of court.  ECF No. 36.  Defendant objects to the filing as unauthorized
27   supplemental briefing.  ECF No. 37.  The court considers the authority but disregards the
     accompanying argument.
28

1   traced directly to the Director's letters, "rather than to that of some other actor not before the

2   court," *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005).

3                           3.       Redressability

4                   Plaintiffs have likewise satisfied the redressability requirement of standing.  To

5   sufficiently allege redressability, "[p]laintiffs need not demonstrate that there is a guarantee that

6   their injuries will be redressed by a favorable decision"; rather, they need show only that a

7   favorable decision would result in a "change in a legal status" that "would amount to a significant

8   increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury

9   suffered." *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (internal quotation marks and

10  citations omitted).  Here, the complaint alleges the seven private health insurers contracted by

11  plaintiffs previously made the voluntary business decision to offer health plans that excluded

12  coverage for abortions, and only stopped offering such plans after they received the letters from

13  the Director.  Compl. ¶¶ 24–25, 41, 44–45.  A favorable legal decision would significantly

14  increase the likelihood these same insurers would again offer plans limiting or excluding

15  coverage for abortions.  Plaintiffs have sufficiently alleged Article III standing.

16                  While at hearing defendant's counsel argued that even if plaintiffs have Article III

17  standing, prudential standing considerations would render any amendment futile, the court at this

18  time does not find prudential considerations stand in the way of allowing amendment if

19  defendant's motion is otherwise granted.

20                  The court next considers defendant's arguments to dismiss each claim under

21  Rule 12(b)(6).

22          B.      Free Exercise of Religion

23                  The Free Exercise Clause of the First Amendment, which applies to the states

24  through the Fourteenth Amendment, *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides

25  that "Congress shall make no law respecting an establishment of religion, or prohibiting the free

26  exercise thereof . . . ."  U.S. Const. amend. I.  However, the right to freely exercise one's religion

27  "does not relieve an individual of the obligation to comply with a valid and neutral law of general

28  applicability on the ground that the law proscribes (or prescribes) conduct that his religion

                                                    12

1   prescribes (or proscribes)." *Emp't Div. v. Smith*, 494 U.S. 872, 879 (1990) (internal quotation

2   marks and citation omitted).[3]   It is well established that a valid and neutral law of general

3   applicability must be upheld if it is rationally related to a legitimate governmental purpose.

4   *Stormans*, 794 F.3d at 1075–76, 1084.  In contrast, laws that are not neutral or are not generally

5   applicable are subjected to strict scrutiny. *Id.* at 1076.

6           "The tests for '[n]eutrality and general applicability are interrelated, and . . . failure

7   to satisfy one requirement is a likely indication that the other has not been satisfied.'" *Id.*

8   (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah ("Lukumi")*, 508 U.S. 520, 531

9   (1993)).  Nevertheless, the court must consider each criterion separately. *Id.*[4]

10          1.    Neutrality

11          A law is not neutral if its object is to infringe upon or restrict practices because of

12  their religious motivation. *Id.* (citing *Lukumi*, 508 U.S. at 533).  In determining neutrality, courts

13  consider both the text and the operation of the law.  "A law lacks facial neutrality if it refers to a

14  religious practice without a secular meaning discernable from the language or context." *Lukumi*,

15  508 U.S. at 533.  Here, the Director's letters and the underlying laws that they purportedly

16  enforce do not refer to any religious practice, conduct, belief, or motivation on their face.

17          Even if a law or enforcement action based on the law is facially neutral, however,

18  it is not neutral if it operates as a "covert suppression of particular religious beliefs." *Id.* at 534

19  (citation omitted).  In determining operational neutrality, as this court has had occasion to note, a

20          [3] Although *Smith* was superseded by the Religious Freedom Restoration Act of 1993
21  ("RFRA"), the Supreme Court later held that RFRA applies only to the federal government and
    not to the states. *See Holt v. Hobbs*, __U.S. __, 135 S. Ct. 853, 859–60 (2015); *Stormans, Inc. v.*
22  *Wiesman*, 794 F.3d 1064, 1075 n.4 (9th Cir. 2015).  RFRA provides broader protection for free
    exercise than does the Constitution. *See Stormans*, 794 F.3d at 1075 n.4.
23
            [4] In its reply brief, defendant for the first time raised the argument that the burden imposed
24  by the letters on plaintiffs' religious exercise is insufficient to support a free exercise claim under
    *Goehring v. Brophy*, 94 F.3d 1294 (9th Cir. 1996), *superseded on other grounds by statute, as*
25  *recognized in Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024 (9th Cir. 2007).  Reply at 5–7.
    At hearing, defendant stated the court could choose to not rely on *Goehring* and instead rely on
26  the test for neutral, generally applicable laws.  Because the court finds dismissal to be warranted
    under defendant's other arguments, and it does not have the benefit of briefing from plaintiffs on
27  the issue, the court does not reach defendant's argument under *Goehring*.

28

1   court may consider "the historical background of the decision under challenge, the specific series

2   of events leading to the enactment or official policy in question, and the legislative or

3   administrative history." *Pickup v. Brown*, No. 12-02497, 2015 WL 5522265, at *6 (E.D. Cal.

4   Sept. 16, 2015) (quoting *Lukumi*, 508 U.S. at 543). The Supreme Court's decision in *Lukumi* is

5   illustrative. In *Lukumi*, the Court invalidated city ordinances prohibiting the religious sacrifice of

6   animals because the ordinances' exemptions proved that the real purpose of the legislation was to

7   target Santeria religious beliefs. 508 U.S. at 538. The Court found that "[t]he net result of the

8   gerrymander [was] that few if any killings of animals [were] prohibited other than Santeria

9   sacrifice . . . [K]illings that [were] no more necessary or humane in almost all other circumstances

10  [were] unpunished." *Id.* at 536.

11          In contrast, the Ninth Circuit in *Stormans* found state rules requiring pharmacies to

12  deliver particular contraceptives operated neutrally. 794 F.3d at 1076–78. The court found that

13  "[t]he possibility that pharmacies whose owners object to the distribution of emergency

14  contraception for religious reasons may be burdened disproportionately [did] not undermine the

15  rules' neutrality," because the rules proscribed the same conduct for all, regardless of the

16  motivation. *Id.* at 1077–78. And unlike the exemptions in *Lukumi*, the exemption for individual

17  pharmacists who have religious, moral, philosophical, or personal objections to the delivery of the

18  drugs did not reveal a covert intent to suppress particular religious beliefs. *Id.* at 1078.

19          Here, the complaint generally alleges the Director issued the letters to the private

20  insurers "to suppress the religious exercise of Plaintiffs and other similarly situated churches and

21  religious employers." Compl. ¶ 103. In their opposition brief, plaintiffs argue the following

22  factual allegations "support a reasonable inference that the Director, through the [letters], sought

23  to suppress, target, or single out religion," Opp'n at 10–11 (citation and internal quotation marks

24  omitted):

25          • Because existing law and regulations define "basic health care
            services" to include services only "where medically necessary,"
26          Compl. ¶ 35, the Director previously permitted health insurance
            plans to limit or exclude abortion coverage. *Id.* ¶¶ 46–47.

27

28

• The Director issued the Mandate after learning that two Catholic universities eliminated elective abortion coverage from their health care plans. *Id.* ¶ 48.

• Only a "very small fraction" of California group health plans excluded or limited abortion coverage, Compl. Ex. 1 at 2, 4, 6, 8, 10, 12, and 14, and the Director knew that the Mandate would primarily affect churches and religious employers and coerce them to violate their sincerely held religious beliefs. Compl. ¶¶ 7, 31–35, 40, 62, 103.

• The Director promulgated the Mandate without any public notice or comment, and encouraged the health plan providers to hide the inclusion of abortion coverage, telling them that they could "omit any mention of coverage for abortion services in health plan documents." *Id.* ¶¶ 26, 42; *see also* Compl. Ex. 1. at 3, 5, 7, 9, 11, 13, and 15.

• The Director issued the Mandate despite knowing it violated the federal Hyde-Weldon Amendment, which prohibits funds made available in the federal Labor, Health and Human Services, and Education Appropriations Act from being transferred to a state if the state "subjects any institutional or individual health care entity [deferred to include a health insurance plan] to discrimination on the basis that the health care entity does not provide for, pay for, provide coverage of, or refer for abortions." *See* Section 507(d) of the Consolidated Appropriations Act, Pub. L. No. 113-76, 128 Stat. 5 (Jan. 17, 2014). California receives approximately seventy billion dollars in federal funds for programs under the Labor, Health and Human Services, and Education Appropriations Act. Compl. ¶¶ 76, ¶¶ 73–78.[5]

• There are categorical and individualized exemptions to the Knox-Keene Act and the Mandate's requirements. *Id.* ¶¶ 49–54, 89, 123.

• The Director chose to apply the Mandate to churches and religious employers even though California exempts religious employers from similar provisions of the Knox-Keene Act (e.g., coverage for contraceptives and fertility treatments). *Id.* ¶¶ 35–36, 38.

---

[5] Defendant requests that the court take judicial notice of the existence and contents of a letter issued on June 21, 2016 by the Office for Civil Rights of the U.S. Department of Health and Human Resources advising plaintiffs' counsel that the office has concluded its investigation into allegations that the DMHC's letters violated the Hyde-Weldon Amendment and "is closing its investigation of these complaints without further action." Def.'s Suppl. Req. Jud. Notice Ex. D at 1, 5, ECF No. 38. Although the court takes judicial notice of the existence of this letter, it is not appropriate to take judicial notice of the veracity of the letter's contents or conclusions, which are in dispute. *See Cactus Corner, LLC v. U.S. Dep't of Agric.*, 346 F. Supp. 2d 1075, 1098–1100 (E.D. Cal. 2004), *aff'd*, 450 F.3d 428 (9th Cir. 2006); Fed. R. Evid. 201(b)(2).

1    Plaintiff's allegations regarding the Director's knowledge and intent are

2  conclusory and speculative, and therefore are not entitled to any presumption of truth.  *See Iqbal*,

3  556 U.S. at 680–81.  The complaint contradicts its allegations that the Director promulgated the

4  Mandate without any public notice and encouraged the insurers to hide the changes, *see* Compl.

5  ¶¶ 26, 42, by also alleging that the Director published the letters on the DMHC website, *see id.*

6  ¶ 27; Compl. Ex. 2.  The remaining allegations, such as the broad allegation that the Director

7  knew that the letters would primarily affect churches and religious employers, do not support a

8  reasonable inference the Director issued the letters "because of, not merely in spite of," the

9  letters' adverse effects on religion.  *See Iqbal*, 556 U.S. at 676–77, 681 (citations and internal

10  quotation marks omitted).  The letters prohibit the same limitations on or exclusions from

11  coverage for all insurers, regardless of the motivation for those limitations or exclusions.  *See*

12  *Stormans*, 794 F.3d at 1077–78.  In addition, the Director has provided legitimate, non-

13  discriminatory reasons for issuing the letters.  Although the Knox-Keene Act provides for certain

14  categorical and individualized exemptions from its requirements, plaintiffs have not shown those

15  exemptions were designed or have been applied in a way that evidences anti-religious intent.  As

16  a result, this case is factually distinct from *Lukumi*.  The complaint here fails to allege the letters

17  are not neutral.

18    The court next considers whether the letters are generally applicable.

19    2.    General Applicability

20    A law is not generally applicable if it "impose[s] burdens only on conduct

21  motivated by religious belief" in a "selective manner."  *Lukumi*, 508 U.S. at 543.  For example, a

22  law is not generally applicable if its prohibitions "substantially underinclude non-religiously

23  motivated conduct that might endanger the same governmental interest that the law is designed to

24  protect."  *Stormans*, 794 F.3d at 1079.

25    Here, plaintiffs argue the letters are not generally applicable because the Knox-

26  Keene Act exempts a number of secular organizations and employers, such as health plans

27  directly operated by educational institutions, *see* Cal. Health & Safety Code § 1343(e), in a way

28  that dramatically undermines the purported governmental interest, and the Director "has

1    'unfettered discretion' to grant individual exemptions and waivers from the Knox-Keene Act and,

2    by extension, the [requirements of the letters]," Opp'n at 12 (citing Cal. Health & Safety Code

3    §§ 1343(b), 1344(a)).

4           The court disagrees.  The letters on their face apply equally to insurers regardless

5    of whether the motivation for the limitations or exclusions is religious or secular.  In addition, the

6    exemptions and discretion discussed by plaintiffs are provided for by the Knox-Keene Act itself,

7    whose constitutionality plaintiffs do not challenge.  The complaint alleges no facts suggesting the

8    Director has exercised or would exercise her discretion to enforce the requirements of the letters

9    in a selective manner to target religious beliefs.  *See Grace United Methodist Church v. City of*

10   *Cheyenne*, 451 F.3d 643, 651 (10th Cir. 2006) (rejecting adoption of *per se* rule requiring that

11   laws permitting any individualized exemptions must satisfy strict scrutiny to survive a free

12   exercise challenge), *discussed favorably in Stormans*, 794 F.3d at 1082; *see also Lighthouse Inst.*

13   *for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276 (3d Cir. 2007).  Plaintiffs note the

14   Director admitted in her briefing that she has already granted an individualized exemption to one

15   health plan.  Opp'n at 15 (citing Mot. at 5 n.2).  But the Director specifically admitted allowing

16   the plan to offer contracts limiting abortion coverage to "religious employers."  Mot. at 5 n.2.  If

17   true, such a fact would evidence her intent to accommodate, rather than impose burdens on,

18   religious belief.

19          The complaint does not allege facts supporting a plausible inference that the letters

20   are neither neutral nor generally applicable.  Accordingly, if plaintiffs were to proceed with the

21   complaint as currently alleged, the letters would ultimately be evaluated under rational basis

22   review.  *See Stormans*, 794 F.3d at 1075–76, 1084.

23          3.      Rational Basis

24          To survive rational basis review, a law must be rationally related to a legitimate

25   governmental purpose.  *Id.*  Here, the letters are rationally related to the government's legitimate

26   purposes of ensuring employers provide basic health care services as defined by the Director and

27   protecting a woman's fundamental right under California law to obtain an abortion.

28

1    In this light, the complaint does not state a claim that the letters, which implement

2    a neutral law of general applicability, violate plaintiffs' rights under the Free Exercise clause.

3    However, it appears plaintiffs may be able to allege additional facts that would state a Free

4    Exercise claim.  In light of the Federal Rules' policy of favoring amendments, the court GRANTS

5    plaintiffs leave to amend if they can do so consonant with Rule 11.  *See* Fed. R. Civ. P. 15(a)(2);

6    *Ascon Properties, Inc. v. Mobil Oil Co*., 866 F.2d 1149, 1160 (9th Cir. 1989).

7        C.      Establishment Clause

8              1.      Legal Standard

9    The Establishment Clause of the First Amendment to the United States

10   Constitution provides that "Congress shall make no law respecting an establishment of religion."

11   U.S. Const. amend. I.  This clause prohibits the government from endorsing or disapproving of

12   religion.  *Am. Family Ass'n, Inc. v. City & Cty. of S.F.*, 277 F.3d 1114, 1120–21 (9th Cir. 2002).

13   To determine whether government conduct violates the Establishment Clause, courts apply the

14   disjunctive three-prong test established in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971).

15   However much maligned, the *Lemon* test remains controlling on Establishment Clause violations.

16   *Catholic League for Religious & Civil Rights v. City & Cty. of S.F.*, 624 F.3d 1043, 1054–55 (9th

17   Cir. 2010) (en banc).  Under the *Lemon* test, government conduct violates the Establishment

18   Clause if it "(1) has a predominantly religious purpose; (2) has a principal or primary effect of

19   advancing or inhibiting religion; or (3) fosters excessive entanglement with religion." *Catholic*

20   *League*, 624 F.3d at 1060 (Silverman, J., concurring); *id.* at 1055.

21   "The [first] prong of the *Lemon* test asks whether government's actual purpose is

22   to endorse or disapprove of religion." *Kreisner v. City of San Diego*, 1 F.3d 775, 782 (9th Cir.

23   1993) (citation omitted).  However, "[a] practice will stumble on the [first] prong only if it is

24   motivated wholly by an impermissible purpose." *Id.* (internal quotation marks and citation

25   omitted).  "A reviewing court must be reluctant to attribute unconstitutional motives to

26   government actors in the face of a plausible secular purpose." *Id.* (internal quotation marks and

27   citations omitted).

28

The second prong of the *Lemon* test focuses on the "primary" effect of the government's conduct.  *Am. Family Ass'n, Inc.*, 277 F.3d at 1122 (emphasis omitted).  The question under this prong is "whether it would be objectively reasonable for the government action to be construed as sending primarily a message of either endorsement or disapproval of religion."  *Vernon v. City of L.A.*, 27 F.3d 1385, 1398 (9th Cir. 1994).

The third prong of the *Lemon* test "seeks to minimize the interference of religious authorities with secular affairs and secular authorities in religious affairs."  *Id.* at 1399 (citation omitted).  "Administrative entanglement typically involves comprehensive, discriminating, and continuing state surveillance of religion."  *Id.*

2.      Application

Here, plaintiffs' allegations do not state a claim under the Establishment Clause.  Plaintiffs assert a claim under only the first two prongs of the *Lemon* test.  *See* Compl. ¶¶ 108–13; Opp'n at 18.  Under the first prong, a plausible secular purpose underlies the Director's actions and the state law protections: to ensure that women in California have access to what the Director views as "basic health services," and that plans do not discriminate against women who choose to terminate their pregnancies, regardless of the plans' religious or other affiliations.  Accordingly, the complaint has not shown the letters were "motivated wholly by an impermissible purpose."  *See Kreisner*, 1 F.3d at 782.

Under the second prong, a reasonable observer would not view the Director's letters as sending "primarily" a message disapproving of religion.  *See Vernon*, 27 F.3d at 1398.  The letters do not mention any religious practice or belief, and opposition to coverage of abortion services is not an exclusively religious position.  Moreover, the letters state that their purpose is to ensure compliance with state law, which is a secular purpose.

Because plaintiffs could not cure the claim's deficiencies by alleging additional facts, the court dismisses plaintiffs' Establishment Clause claim without leave to amend.  *See* Fed. R. Civ. P. 15(a)(2); *Ascon Props.*, 866 F.2d at 1160.

1          D.       Free Speech

2                  Defendant also moves to dismiss plaintiffs' Free Speech claim because the

3    Director's letters do not implicate plaintiffs' rights to free speech.  Mot. at 18–19.  The Free

4    Speech Clause of "[t]he First Amendment protects not only the expression of ideas through

5    printed or spoken words, but also symbolic speech—nonverbal 'activity . . . sufficiently imbued

6    with elements of communication.'"  *Roulette v. City of Seattle*, 97 F.3d 300, 302–03 (9th Cir.

7    1996) (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)).  Conduct amounts to

8    expression when "[a]n intent to convey a particularized message [is] present, and . . . the

9    likelihood [is] great that the message would be understood by those who viewed it."  *Id.* (quoting

10   *Spence*, 418 U.S. at 410–11).  For example, in *Spence*, the Court found the act of displaying an

11   American flag with a peace sign on it to protest American bombing in Cambodia and the National

12   Guard's killing of anti-war demonstrators at Kent State constituted symbolic speech.  418 U.S.

13   at 410–11.  The Court has also found that burning the American flag as part of a political

14   demonstration is sufficiently expressive to warrant First Amendment protection.  *Texas v.*

15   *Johnson*, 491 U.S. 397, 406 (1989).

16                 Here, plaintiffs argue the conduct of purchasing a group health plan that includes

17   coverage of elective abortions is symbolic speech that communicates a message that abortion is

18   morally permissible.  Opp'n at 20.  Plaintiffs contend this speech interferes with plaintiffs' own

19   message that abortion is morally wrong.  *Id.*

20                 The complaint does not state a cognizable Free Speech claim.  The letters do not

21   compel plaintiffs, as purchasers of a regulated plan, to directly convey any message regarding

22   their views on abortion, and the conduct of offering a group health plan that includes elective

23   abortion coverage is not sufficiently expressive to be considered symbolic speech, *see Catholic*

24   *Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527, 558 (2004) (church-affiliated

25   employer's compliance with law requiring coverage for prescription contraceptives in group

26   health care plan "is not speech"); *see also Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*,

27   547 U.S. 47, 62 (2006) ("[I]t has never been deemed an abridgment of freedom of speech or press

28   to make a course of conduct illegal merely because the conduct was in part initiated, evidenced,

1  or carried out by means of language, either spoken, written, or printed." (quoting *Giboney v.*

2  *Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949))).  Unlike the starkly expressive act of flag

3  burning, the conduct here of purchasing group health plans that are required by law to provide

4  abortion coverage is not likely to be viewed as conveying a particularized ideological message.

5  *See Rumsfeld*, 547 U.S. at 66.  Moreover, the plaintiff churches are free to disassociate

6  themselves from any view that abortion is morally permissible and can explain to their

7  constituents that DMHC-regulated plans are required by law to include elective abortion

8  coverage.  *See id.* at 64–65.

9          Because plaintiffs could not cure the claim's deficiencies by alleging additional

10  facts, the court dismisses plaintiffs' Free Speech claim without leave to amend.  *See* Fed. R. Civ.

11  P. 15(a)(2); *Ascon Props.*, 866 F.2d at 1160.

12          E.      Equal Protection

13          The Equal Protection Clause of the Fourteenth Amendment prohibits a state from

14  "deny[ing] to any person within its jurisdiction the equal protection of the laws," U.S. Const.

15  amend. XIV, which essentially "direct[s] that all persons similarly situated should be treated

16  alike," *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

17          Here, the complaint generally alleges plaintiffs were treated differently than

18  similarly situated persons and businesses "in that there are categorical and individualized

19  exemptions to the Knox-Keene Act and the [letters'] requirements."  Compl. ¶ 123.  The

20  complaint's conclusory allegations fail to state a plausible claim under the Equal Protection

21  Clause.  The letters apply to Plans, not plan purchasers, and do not make any classification with

22  respect to purchasers.  In addition, as explained above, the complaint alleges no facts establishing

23  that the exemptions have been applied selectively based on religion.  *See Skyline Wesleyan*

24  *Church*, No. 16-501, *supra* (dismissing similar equal protection claim challenging the same

25  DMHC letters).

26          The complaint does not state an Equal Protection claim.  However, in light of the

27  Federal Rules' policy of favoring amendments, the court GRANTS plaintiffs leave to amend their

28

1    Equal Protection claim to plead additional facts if they can do so consonant with Rule 11. *See*

2    Fed. R. Civ. P. 15(a)(2); *Ascon Props.*, 866 F.2d at 1160.

3    V.    CONCLUSION

4         For the foregoing reasons, the court GRANTS defendant's motion to dismiss for

5    failure to state a claim.  The court DISMISSES plaintiffs' Establishment Clause and Free Speech

6    claims without leave to amend as futile.  However, the court GRANTS plaintiffs leave to amend

7    their Free Exercise and Equal Protection claims if they can do so consonant with Rule 11.

8    Plaintiffs shall file an amended complaint, if any, within twenty-one (21) days of the date this

9    order is filed.

10        As noted above, the court also GRANTS defendant's request for judicial notice of

11    the existence of the June 21, 2016 letter issued by the Office for Civil Rights of the U.S.

12    Department of Health and Human Resources, but does not take judicial notice of the veracity of

13    the letter's contents or conclusions.  ECF No. 38.  The court considers the supplemental authority

14    submitted by plaintiffs but disregards the accompanying argument.  *See* ECF Nos. 36–37.

15        This order resolves ECF Nos. 21, 22, 36, 37, and 38.

16        IT IS SO ORDERED.

17    DATED:  July 11, 2016.

18

19    _____

20    UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28