Eric C. Rassbach (California Bar No. 288041)
The Hugh and Hazel Darling Foundation
Religious Liberty Clinic
Pepperdine Caruso School of Law
24255 Pacific Coast Hwy.
Malibu, CA 90263
eric.rassbach@pepperdine.edu
Telephone: (310) 506-4611

Noel J. Francisco*
Megan Lacy Owen*
Audrey Beck*
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
njfrancisco@jonesday.com
Telephone: (202) 879-3939

Kelly C. Holt*
JONES DAY
250 Vesey St.
New York, NY 10281
Telephone: (212) 326-3939

*Applications *pro hac vice* forthcoming

*Attorneys for Amicus Curiae*
*The California Catholic Conference*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **FOOTHILL CHURCH; CALVARY CHAPEL CHINO HILLS; SHEPHERD OF THE HILLS CHURCH,**<br><br>*Plaintiffs*,<br>v.<br><br>**MARY WATANABE**, in her official capacity as Director of the California Department of Managed Health Care,<br><br>*Defendant*. | Case No. 2:15-cv-02165-KJM-EFB<br><br>**BRIEF AMICUS CURIAE OF THE CALIFORNIA CATHOLIC CONFERENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing: June 17, 2022, 10 a.m.<br>Ctrm 3, 15th floor<br>Judge: Hon. Kimberly J. Mueller |

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1
ARGUMENT ..........................................................................................................1
   I.    The Mandate Violates The Free Exercise Clause ...........................................1
       A.    The Mandate Is Not Generally Applicable ...........................................2
       B.    The Mandate Is Not Neutral ..................................................................4
       C.    The Mandate Does Not Satisfy Strict Scrutiny.....................................5
   II.   The Mandate Interferes With Church Autonomy ..........................................7
CONCLUSION ......................................................................................................12

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) ............................................................................................... 5

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ....................................................................................... 3, 4, 5

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ............................................................................................... 5

*Emp. Div., Dep't of Hum. Res. of Or. v. Smith*,
  494 U.S. 872 (1990) ............................................................................................... 1

*Foothill Church v. Watanabe*,
  3 F.4th 1201 (9th Cir. 2021) ......................................................................... 2, 3, 4, 5

*Fulton v. City of Philadelphia*,
  141 S. Ct. 1868 (2021) .................................................................................. *passim*

*Gonzales v. O Centro Espírita Beneficente União*,
  546 U.S. 418 (2006) ............................................................................................... 6

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
  565 U.S. 171 (2012) ........................................................................................ 7, 10

*Kedroff v. Saint Nicholas Cathedral of Russian
  Orthodox Church in N. Am.*,
  344 U.S. 94 (1952) ................................................................................................. 8

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
  138 S. Ct. 1719 (2018) ........................................................................................... 4

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  140 S. Ct. 2049 (2020) ........................................................................... 7, 9, 10, 11

*Roman Catholic Diocese of Albany v. Emami*,
  142 S. Ct. 421 (2021) ........................................................................................... 11

*S. Bay United Pentecostal Church v. Newsom*,
  985 F.3d 1128 (9th Cir. 2021) ............................................................................... 6

*Seattle's Union Gospel Mission v. Woods*,
  142 S. Ct. 1094 (2022) ........................................................................................... 8

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Serbian E. Orthodox Diocese for U.S. of Am. &
    Canada v. Milivojevich*,
    426 U.S. 696 (1976) .................................................................................. 8, 10, 11

*Stormans, Inc. v. Wiesman*,
    794 F.3d 1064 (9th Cir. 2015) ................................................................................ 4

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) (per curiam) ................................................................. 3, 5

*Watson v. Jones*,
    80 U.S. (13 Wall.) 679 (1872) ............................................................................ 7, 9

**STATUTES**

Cal. Health & Safety Code § 1343 ............................................................................ 2, 3

Cal. Health & Safety Code § 1344 ................................................................................. 2

Cal. Health & Safety Code § 1367 ................................................................................. 2

Cal. Health & Safety Code § 1367.25 ................................................................. 7, 9, 10

**OTHER AUTHORITIES**

Adam Beam, *California Plans to be Abortion Sanctuary if
    Roe Overturned*, Associated Press (Dec. 8, 2021) ................................................ 6

Cal. Code Regs. tit. 28, § 1300.43 .................................................................................. 3

Foothill Church, *Mission*, https://www.foothill.church/outreach (last
    visited Apr. 6, 2022) ........................................................................................ 9, 11

Foothills Pregnancy Res. Ctr., *Our Mission*,
    https://www.foothillsprc.org (last visited Apr. 6, 2022) ...................................... 9

N.Y. Comp. Codes R. & Regs. tit. 11 § 52.2 ............................................................... 11

# INTRODUCTION

Last year, the Supreme Court held that when a state law is subject to "a system of individual exemptions," the state "may not refuse to extend that … system to cases of 'religious hardship' without compelling reason." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1878 (2021) (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990)). But that is exactly what the California Department of Managed Health Care (the "DMHC") has done by requiring churches and other religious organizations to carry healthcare plans that cover elective abortions. Since 2014, the DMHC has used its authority under California's Knox-Keene Act to require licensed health insurance providers to cover elective abortions (the "mandate"). But while DMHC has exercised its authority to provide both individual and categorical exemptions from the mandate, Plaintiffs in this case (Foothill Church, Calvary Chapel Chino Hills, and Shepherd of the Hills Church, collectively the "Churches") remain subject to the mandate, in violation of their sincerely held religious beliefs. And because the DMHC's mandate is neither narrowly tailored nor supported by any compelling state interest, it fails strict scrutiny.

Worse still, the mandate directly interferes with religious organizations' management of their own affairs, in contradiction of the Supreme Court's longstanding church autonomy jurisprudence. This Court should not countenance either of these constitutional violations.

# ARGUMENT

## I. The Mandate Violates The Free Exercise Clause.

The DMHC's mandate violates the Free Exercise Clause under the rule, applied in *Fulton*, that strict scrutiny applies to state laws that burden religion and are subject to "individualized exemptions." *Fulton*, 141 S. Ct. at 1876–77. Nor is the selective discrimination that prevails under the mandate neutral under Supreme Court precedent. And because DMHC can offer no justification for the mandate that

satisfies strict scrutiny, the mandate cannot stand.

### A. The Mandate Is Not Generally Applicable.

The DMHC's mandate is not generally applicable, and thus triggers strict scrutiny, for two separate reasons: First, it includes a system of individualized exemptions, and second, it includes a set of categorical exemptions.

*Individualized exemptions.* The Supreme Court in *Fulton* held that laws that "incorporate[] a system of individual exemptions" must be subject to strict scrutiny, even if the government defendant **never issues** such an exemption. *Fulton*, 141 S. Ct. at 1878. As Judge Bress has already pointed out, DMHC's mandate is just such a system. *See Foothill Church v. Watanabe*, 3 F.4th 1201, 1207 (9th Cir. 2021) (Bress, J., dissenting). Under the rule of *Fulton*, a "law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877. And because strict scrutiny applies to laws that are not generally applicable, the *Fulton* Court applied strict scrutiny to a state law that "incorporate[d] a system of individual exemptions, made available … at the 'sole discretion' of the Commissioner." *Id.* at 1878.

The rule of *Fulton* applies to this case with full force. The DMHC's mandate is not generally applicable because it is subject to a system of individualized exemptions. The Director has broad discretion to "exempt a plan contract or any class of plan contracts" from the Knox-Keene Act's requirement that a plan provide all "basic health care services." Cal. Health & Safety Code § 1367(i). Under another provision of the law, the Director may exempt persons or plans when "in the public interest and not detrimental to the protection of subscribers, enrollees, or persons regulated under this chapter." *Id.* § 1343(b); *see also id.* § 1344(a) (similar authority to waive requirements "in the public interest"). Indeed, California's briefing before the Ninth Circuit in this case described the Director's authority expressly as "Individualized Exemption Authority." ECF 20, *Foothill Church*, 3 F.4th 1201 (No.

19-15658). And the Director has not hesitated to use that authority, including to grant an exemption for religious organizations that oppose elective abortion except in cases of rape or incest. *See* ECF 110-1, Def.'s Statement of Undisputed Material Facts, at 3 ¶¶ 7–8; ECF 111-2, Pls.' Statement of Undisputed Material Facts, at 6 ¶ 33. As Judge Bress observed, this "Individualized Exemption Authority" is the "key feature of California's regime that takes it outside of rational basis review and places it squarely into strict scrutiny." *Foothill Church*, 3 F.4th at 1204 (Bress, J., dissenting).

*Categorical exemptions.* The DMHC's mandate is also not generally applicable because it includes broad categorical exemptions. "[C]ategories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993). Where a categorical exemption threatens the government's interests "in a similar or greater degree than [the prohibited religious exercise] does," it must face strict scrutiny. *Id*. at 543. Furthermore, "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam).

The DMHC's mandate does exactly that. California exempts entire categories of healthcare plans from its requirements, including plans "directly operated by a bona fide public or private institution of higher learning," Cal. Health & Safety Code § 1343(e), and "[s]mall plans" administered solely by an employer that "does not have more than five subscribers," *see* Cal. Code Regs. tit. 28, § 1300.43. But religious organizations like Plaintiffs have received no such exemption under the Director's individualized exemption regime. For this reason, too, the mandate is not generally applicable.

The mandate is also "underinclusive with regard to" the DMHC's asserted interest in providing universal coverage for elective abortions. *Lukumi*, 508 U.S. at 544–45. Given the many exemptions available to secular entities, the mandate in

practice implicates *only* religious conduct. Indeed, Plaintiffs maintain that "the DMHC was not aware of *any* non-religious employer that had purchased plans that limited coverage for elective abortions," *Foothill Church*, 3 F.4th at 1203 (Bress, J., dissenting) (emphasis added); ECF 111-2, Pls.' Statement of Undisputed Material Facts, at 5 ¶ 27, and the DMHC has identified none. But the government's asserted interest in ensuring the availability of elective abortion coverage applies with equal force to healthcare plans operated by institutions of higher education and small plans with fewer than five subscribers—neither of which are subject to the mandate. These exemptions "endanger[]" the DMHC's asserted interest to "a similar or greater degree" than accommodating the Plaintiffs and similarly situated religious bodies would. *Lukumi*, 508 U.S. at 543. The mismatch between the government's asserted interest in universal coverage for elective abortions and the system of exemptions it nevertheless permits thus underscores that strict scrutiny applies.

### B. The Mandate Is Not Neutral.

Strict scrutiny also applies because the DMHC's mandate is not neutral. As the Supreme Court reiterated in *Fulton*, "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877 (citing *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1730–32 (2018)); *Lukumi*, 508 U.S. at 533).

Similarly, the Ninth Circuit has recognized that "an open-ended, purely discretionary standard like 'without good cause' easily could allow discrimination against religious practices or beliefs" in the manner the Supreme Court has proscribed. *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1081 (9th Cir. 2015). Exactly that has happened here. The Director has treated not only secular interests, but also *other religious* interests, more favorably than the Plaintiffs' religious practices. *See* ECF 111-2, Pls.' Statement of Undisputed Material Facts, at 6 ¶¶ 33–34; *see also Foothill Church*, 3 F. 4th at 1206 (Bress, J., dissenting). Here, DMHC's "wildly underinclusive" array of individualized and categorical exemptions effectively

amount to selective enforcement that "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011).

This should not be surprising in light of the mandate's origins: The mandate independently fails the neutrality test because of the discriminatory intent behind it. The DMHC issued the mandate "[i]n response to learning that two Catholic universities in California had removed elective abortion coverage from their employee health plans," and after "abortion advocates urged the DMHC to stop permitting health plans under which religious employers could offer more limited abortion coverage options." *Foothill Church*, 3 F.4th at 1202 (Bress, J., dissenting); *see* ECF 111-2, Pls.' Statement of Undisputed Material Facts, at 6–7 ¶¶ 35–41. And in response, "the DMHC's Director eventually agreed to make a policy change." *Foothill Church*, 3 F.4th at 1202–03 (Bress, J., dissenting). Here, as in *Lukumi*, the fact that the mandate came to exist "'because of,' not merely 'in spite of,' [its] suppression of ... religious practice is revealed by the events preceding [its] enactment." 508 U.S. at 540 (citation omitted). And here, as in *Lukumi*, the mandate is subject to strict scrutiny as a result.

### C. The Mandate Does Not Satisfy Strict Scrutiny.

The mandate cannot satisfy strict scrutiny, the "most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). And "the government has the burden to establish that the challenged [policy] satisfies strict scrutiny." *Tandon*, 141 S. Ct. at 1296–97. "A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881 (quoting *Lukumi*, 508 U.S. at 546).

The *Fulton* Court made clear that the key question in strict scrutiny analysis is not whether the government has, in general, a compelling interest in enforcing its

5

Brief Amicus Curiae of The California Catholic Conference

policies, but instead whether the government has a compelling interest in denying the specific claimants at issue an exception to its policy. *See id.* ("[C]ourts must scrutinize the asserted harm of granting *specific* exemptions to *particular* religious claimants." (emphasis added) (internal quotation marks omitted)).

The Director has offered no reason at all, let alone a compelling reason, why Plaintiffs should not be entitled to the same exemption from the mandate other entities have received. The mere prospect that other religious organizations also would seek exemptions from the mandate does not count; it only "echoes the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions" (except those already granted). *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 435–36 (2006). Nor can the Director claim that the Knox-Keene Act itself has always justified the interest she asserts in the mandate, because the mandate was imposed decades after that statute's enactment.

In addition, the mandate is not narrowly tailored because the Director could achieve the goal of ensuring abortion coverage through other means. *See S. Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, 1142 (9th Cir. 2021) ("Narrow tailoring requires that the State employ the least restrictive means to advance its objective." (internal quotation marks omitted)). If California "can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881. But the Director has not shown why forcing the Churches to violate their religious beliefs is the least restrictive means of achieving any relevant goal.

For example, if the Director's interest is in ensuring abortion coverage, California itself could accomplish that goal by funding the coverage the mandate now compels. Indeed, Governor Newsom has proposed that California should become a "sanctuary" even for women *from other States* who seek to obtain abortions, paying for the procedures as well as travel and lodging. *See* Adam Beam, *California Plans to be Abortion Sanctuary if Roe Overturned*, Associated Press (Dec. 8, 2021),

https://tinyurl.com/3exw886c. Alternatively, if the Director's interest in denying the Churches an exemption from the mandate is in reducing the burden of processing exemptions, the Director could simply offer religious employers a blanket exemption from the mandate if compliance would burden their religious beliefs (in a manner akin to the contraceptive coverage exemption). *See, e.g.*, Cal. Health & Safety Code § 1367.25(c) (requiring health insurers to provide religious employers with contraceptive-free plans if contraceptives "are contrary to the religious employer's religious tenets"). Because the Director could achieve the mandate's goals through other means, she cannot satisfy strict scrutiny.

## II. The Mandate Interferes With Church Autonomy.

The mandate also independently runs afoul of the First Amendment's protections for church autonomy. As the Supreme Court recently explained, the doctrine of church autonomy safeguards the "independence" of religious organizations "in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020). "State interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion. The First Amendment outlaws such intrusion." *Id.* at 2060.

The "ministerial exception" is one prominent expression of this doctrine. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 185, 188–89 (2012) ("Our decisions in th[is] area confirm that it is impermissible for the government to contradict a church's determination of who can act as its ministers."). But the First Amendment's church autonomy doctrine is not limited to the ministerial exception. As the Supreme Court has long maintained, "civil courts exercise no jurisdiction" over matters involving "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson v. Jones*, 80 U.S. (13 Wall.) 679,

733 (1872); *see also Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (2022) (Alito, J., respecting the denial of certiorari) (explaining that the lower court's "reasoning presumes that the guarantee of church autonomy in the Constitution's Religion Clauses protects only a religious organization's employment decisions regarding formal ministers. But our precedents suggest that the guarantee of church autonomy is not so narrowly confined."). In other words, the First Amendment not only guarantees churches the ability to choose their own ministers but also, more broadly, protects religious institutions "from secular control or manipulation." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952).

The mandate interferes with the ability of California churches and other religious bodies to teach their own members and discipline their own employees according to their religious doctrine. Absent interference from the DMHC's mandate, churches and religious organizations would be able to ensure the integrity of their teaching and practice by declining to fund procedures for their employees that violate their religious tenets. But the mandate requires churches and religious organizations to carry healthcare plans that provide abortion coverage in violation of their religious beliefs. This requirement denies those institutions the ability to ensure that they do not fund procedures for employees that contradict their teachings. And it creates tension in front of the churches' members between their teaching and practice by compelling the apparent endorsement of procedures that violate their tenets.

This interference with church autonomy necessarily requires government entanglement in matters of internal church teaching and governance. Under the First Amendment, "religious controversies are not the proper subject of civil court inquiry"; again, that is because the Constitution prohibits civil authorities from adjudicating matters of "'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them.'" *Serbian E. Orthodox Diocese for U.S. of Am. & Canada v.*

1  *Milivojevich*, 426 U.S. 696, 713–14, 724 (1976) (quoting *Watson*, 80 U.S. at 733–
2  34). But the mandate turns state bureaucrats into armchair pastors, priests, and rabbis
3  by empowering them to decide whether a church should be permitted to govern itself
4  in a manner consistent with its own teaching.

5        Extending the statutory exemption from the Knox-Keene Act's contraceptive
6  coverage requirement would not save the mandate. The DMHC has previously
7  allowed limited abortion coverage in plans for certain "religious employers" (*see*
8  *supra* p. 2; ECF 110-1, Def.'s Statement of Undisputed Material Facts, at 3–4 ¶¶ 7–
9  12; ECF 111-2, Pls.' Statement of Undisputed Material Facts, at 6 ¶ 33) as defined
10 in the statutory exemption from California's contraceptive mandate. That statutory
11 exemption applies to certain "religious employer[s]" who: (A) have the purpose of
12 inculcating religious values; (B) primarily employ persons who share their religious
13 tenets; (C) serve primarily persons who share those tenets; and (D) qualify for non-
14 profit tax status. *See* Cal. Health & Safety Code § 1367.25(c)(1). But even if the
15 DMHC granted this exemption from the abortion mandate to religious organizations
16 willing and able to satisfy these constraints, this approach to religious objections
17 would intrude on church autonomy.

18       An exemption that requires a religious organization to exist for the purpose of
19 inculcating religious values, *see id.* § 1367.25(c)(1)(A), intrudes on a church's ability
20 to determine what is "essential to the institution's central mission," *Our Lady of*
21 *Guadalupe*, 140 S. Ct. at 2060, and necessarily entangles the government in
22 arbitrating religious matters. Plaintiff Foothill Church, for example, "exist[s] to
23 glorify God by leading people into a growing relationship with Jesus Christ, rooted
24 in the Gospel." Foothill Church, *Mission*, https://www.foothill.church/outreach (last
25 visited Apr. 6, 2022). As one expression of that mission, Foothill supports a
26 pregnancy resource center that seeks to provide "a safe place where individuals and
27 families are empowered with the tools and support to make healthy life choices." *See*
28 Foothills Pregnancy Res. Ctr., *Our Mission*, https://www.foothillsprc.org (last visited

Apr. 6, 2022). To determine whether such a ministry would qualify for the statutory exemption, a state actor would have to determine whether a ministry that hands out baby bottles alongside Bibles exists for the purpose of inculcating religious values. But under the Supreme Court's precedents, Foothill is entitled to determine for itself that its pregnancy resources ministry achieves its mission of "leading people into a growing relationship with Jesus Christ," whether the government considers that action to inculcate religious values or not. *See Our Lady of Guadalupe*, 140 S. Ct. at 2060–61 ("any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion"). Calvary Chapel and Shepherd of the Hills are entitled to the same self-determination.

An exemption that requires a religious body to *employ* only those who share its tenets, *see* Cal. Health & Safety Code § 1367.25(c)(1)(B), runs afoul of the church autonomy doctrine for similar reasons. Conditioning relief from the mandate in this way "interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs." *Hosanna-Tabor*, 565 U.S. at 188–89. Trading relief from the mandate for compliance with this provision would, again, require state bureaucrats (and ultimately, courts) to arbitrate which employees do and do not share the tenets of a religious organization, akin to evaluating "the conformity of the members of the church to the standard of morals required of them," in violation of Supreme Court precedent. *Milivojevich*, 426 U.S. at 714. And drawing these lines would require resolving difficult theological questions: "Are Orthodox Jews and non-Orthodox Jews coreligionists? … Would Presbyterians and Baptists be similar enough? Southern Baptists and Primitive Baptists?" *Our Lady of Guadalupe*, 140 S. Ct. at 2068–69.

And finally, an exemption that requires religious organizations to *serve* primarily those who share their religious beliefs, *see* Cal. Health & Safety Code § 1367.25(c)(1)(C), would similarly interfere with those organizations' definition of their own mission and require the government to become an arbiter of religious belief.

*See Our Lady of Guadalupe*, 140 S. Ct. at 2060; *Milivojevich*, 426 U.S. at 714. Consider again the mission of Plaintiff Foothill Church, which "exist[s] to glorify God by leading people into a growing relationship with Jesus Christ, rooted in the Gospel." Foothill Church, *Mission*, *supra*. What if Foothill wishes to lead people *it has not yet reached* into such a relationship, and to do so by serving those who do not already share its beliefs? The mandate and the statutory exemption (if they were even available) would answer that a church may not select that mission without purchasing a healthcare plan to which it objects on doctrinal grounds. But again, to limit these religious organizations' mission to ministering to those who already share it would require the government to decide what is "essential to the institution's central mission." *Our Lady of Guadalupe*, 140 S. Ct. at 2060. It would make *some missions*—quite literally, preaching to the choir—acceptable, while imposing severe burdens on the sincerely held beliefs of those who wish to minister or evangelize beyond their own flock. And worse, this exemption would appoint government actors to determine which form of preaching is which. The First Amendment does not tolerate this intrusion into "theological controversy." *See Milivojevich*, 426 U.S. at 714.

The Supreme Court recently signaled the deficiency of exemptions like those in the Knox-Keene Act under the First Amendment when it ordered a New York court to consider again, in light of *Fulton*, whether substantially similar exemptions for religious institutions satisfied the Constitution. *See Roman Cath. Diocese of Albany v. Emami*, 142 S. Ct. 421 (2021); N.Y. Comp. Codes R. & Regs. tit. 11 § 52.2 (defining "[r]eligious employer" in substantially the same way as the California statute). This Court should heed the Supreme Court's instruction in *Diocese of Albany* and recognize that the DMHC's mandate, even if it incorporated the statutory exemption available in the contraceptive context, intrudes on church autonomy in violation of the First Amendment.

# CONCLUSION

For the reasons set forth above, the Court should enter summary judgment in favor of the Churches and enjoin DMHC's abortion coverage mandate.

Dated: April 8, 2022

By: */s/ Eric C. Rassbach*

Eric C. Rassbach (California Bar No. 288041)
The Hugh and Hazel Darling Foundation
Religious Liberty Clinic
Pepperdine Caruso School of Law
24255 Pacific Coast Hwy.
Malibu, CA 90263
eric.rassbach@pepperdine.edu
Telephone: (310) 506-4611

Noel J. Francisco*
Megan Lacy Owen*
Audrey Beck*
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
njfrancisco@jonesday.com
Telephone: (202) 879-3939

Kelly C. Holt*
JONES DAY
250 Vesey St.
New York, NY 10281
Telephone: (212) 326-3939

*Applications *pro hac vice* forthcoming

*Attorneys for Amicus Curiae*
*The California Catholic Conference*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2022, I electronically filed the foregoing with the Clerk of the United States District Court for the Eastern District of California using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

April 8, 2022                                         */s/ Eric C. Rassbach*
                                                             Eric C. Rassbach