1
2
3
4
5
6
7
8                 UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Foothill Church, et al.,                           No. 2:15-CV-02165-KJM-EFB

12                        Plaintiffs,                    ORDER

13           v.

14   Mary Watanabe, in her official capacity as
     Director of the California Department of
15   Managed Healthcare,

16                        Defendant.

17

18          From one vantage point, this case involves a dispute about whether the agency regulating

19   insurance plans in California must consider religious exemption requests from individual

20   enrollees and subscribers if the agency's ordinary practice is to consider requests from health

21   insurance plans.  Alternatively, the dispute centers on whether the agency can order insurance

22   plans to cover abortions, even insurance plans who sell coverage to religious employers that

23   oppose abortion except when the life, not the health, of a pregnant woman is at risk.  Regardless,

24   the complexity of the case warrants a bird's-eye review of the facts.

25          In August 2014, the California Department of Managed Health Care (DMHC or the State)

26   sent letters to seven private health insurers, directing them to remove any limitations on or

27   exclusions of abortion care services from the health care coverage they offered to various

28   employers, including plaintiffs Foothill Church, Calvary Chapel Chino Hills and Shepherd of the

                                                1

1  Hills Church (the Churches).  Riess Decl., Ex. U, Aug. 22, 2014 Letters from DMHC to seven

2  plans (Aug. 22, 2014 Letters) at 2–15, ECF No. 110-24.[1]  The DMHC's Director sent the letters

3  after reviewing the relevant law and realizing the agency had "erroneously approved or did not

4  object to health plans" with such limitations or exclusions.  *Id.* at 2.  Both non-religious and

5  "religious employers," as defined by the relevant statute, had enrolled in these health plans.  Riess

6  Decl. Ex. V at 5, ECF No. 110-25.  The seven insurers readily complied with the State's directive.

7  Def.'s Resp. to Pls.' Statement of Undisputed Material Facts (Def.'s Resp. to Pls.' SUMF) ¶ 21,

8  ECF No. 121-1.

9          After receiving the Director's letters and learning about the changes to their coverage, the

10  Churches contacted their health insurance plans to ask if, as religious organizations, they could

11  obtain insurance that did not require them to provide coverage for "all legal abortions,"

12  Rutherford Decl. ¶¶ 20–21, ECF No. 111-4, that only covered abortion care where the "pregnancy

13  unquestionably threatens the life of the mother," Lewis Decl. ¶¶ 9, 23, ECF No. 111-3, or that

14  "exclude[d] abortion benefits," Hibbs Decl.  ¶¶ 17–18, ECF No. 111-5.  Two insurers explained

15  they understood the State's letter to preclude even religious exemptions.  Hibbs Decl. Ex. 4

16  (Calvary Church email correspondence regarding abortion benefits with Kaiser and Aetna), ECF

17  No. 111-5.  The insurers were incorrect, as the DMHC had determined that "religious employers"

18  could legally restrict abortion coverage consistent with their religious beliefs.  Def.'s Resp. to

19  Pls.' SUMF ¶ 39.  Indeed, the DMHC later approved a request from a plan to exclude coverage

20  for abortion care services for religious employers, except where a pregnant woman "suffers from"

21  a condition "that would, as certified by a physician, place the woman in danger of death unless an

22  abortion is performed," or in the case of a pregnancy resulting from rape or incest.  Galus Decl.

23  Ex. 14 at 31, ECF No. 111-20.  Nevertheless, under the impression they could not secure

24  coverage that comported with their religious beliefs, the Churches filed the present action,

25  alleging the Director's letters violate their constitutional rights under the First and Fourteenth

26  Amendments.  Compl., ECF No. 1.

---

[1] When citing page numbers on filings, the court uses the pagination automatically generated by the CM/ECF system.

1    Only after nearly three years of litigation, after this court had submitted the State's third

2    and final motion to dismiss for decision, did the Churches decide to ask the DMHC for a religious

3    exemption.  Riess Decl., Ex. Y (Letter from Plaintiffs' counsel to DMHC) at 2, ECF No. 110-28.

4    The Churches requested the DMHC exempt them from covering abortions except "when

5    absolutely necessary to save the life of the mother," even in "circumstances of rape and incest."

6    *Id.* at 2–3.  The State's Attorney General replied that DMHC could only consider granting

7    exemptions to health plans, not employers or other plan customers.  Riess Decl., Ex. Y (Letter

8    from DMHC's counsel to Plaintiffs' counsel) at 2–3, ECF No. 110-29.  To date, no health plan

9    has asked DMHC to approve a plan contract that does not cover abortion care services for a

10   woman who becomes pregnant as a result of rape or incest.  However, prior to 2014, at least one

11   health plan offered such limited coverage, though not to the Churches.  *See* Galus Decl. Ex. 9 at 6

12   & 11, ECF No. 111-15; Galus Decl. Ex. 10 at 4, ECF No. 111-16.

13   In 2019, this court granted defendant's motion to dismiss all claims.  *Church v. Rouillard*,

14   371 F. Supp. 3d 742 (E.D. Cal. 2019).  The Ninth Circuit affirmed the dismissal of plaintiffs'

15   Establishment Clause claim, *Foothill Church v. Watanabe*, 854 F. App'x 174 (9th Cir. 2021)

16   (unpublished), but remanded for this court to consider plaintiffs' free exercise and equal

17   protection claims in light of *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868 (2021).

18   *See Foothill Church v. Watanabe*, 3 F.4th 1201 (9th Cir. 2021).[2]  The parties have now filed and

19   briefed cross-motions for summary judgment.  *See* Def.'s Mot. for Summ. J. (Def.'s MSJ), ECF

20   No. 110; Pls.' Mot. for Summ. J. (Pls.' MSJ), ECF No. 111-1; Def.'s Opp'n, ECF No. 121; Pls.'

21   Opp'n, ECF No. 122; Def.'s Reply, ECF No. 123; Pls.' Reply, ECF No. 124.  The court heard

22   argument on the motions on June 15, 2022.  ECF No. 127.  Jeremiah Galus appeared for plaintiffs

23   and Melissa Riess, Karli Eisenberg and Hayley Penan appeared for defendant.  *Id.*  Following the

24   hearing, the court submitted the matters.

---

[2] The Supreme Court's recent decision in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), does not impact this court's analysis.

For the reasons below, **the court grants summary judgment for plaintiffs on their Free Exercise Clause claim and grants summary judgment for defendant on plaintiffs' Equal Protection Clause claim.**

## I.    AMICUS BRIEF

The court first addresses the motion of the California Catholic Conference to file an amicus brief in support of the Churches' motion for summary judgment.  Mot. to File Amicus Curiae, ECF No. 112.

The district court has broad discretion regarding the appointment of amici.  *Hoptowit v. Ray,* 682 F.2d 1237, 1260 (9th Cir. 1982); *In re Roxford Foods Litig.*, 790 F. Supp. 987, 997 (E.D. Cal. 1991) ("The privilege of being heard amicus rests solely within the discretion of the court" (citation omitted)).  "An amicus brief should normally be allowed" when, among other considerations, "the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide."  *Cmty. Ass'n for Restoration of Env't (CARE) v. DeRuyter Bros. Dairy*, 54 F. Supp. 2d 974, 975 (E.D. Wash. 1999) (citing *N. Sec. Co. v. United States*, 191 U.S. 555, 556 (1903)).

While "[h]istorically, amicus curiae is an impartial individual who suggests the interpretation and status of the law, gives information concerning it, and advises the Court in order that justice may be done, rather than to advocate a point of view so that a cause may be won by one party or another[,]" *CARE*, 54 F. Supp. 2d at 975, the Ninth Circuit has said "there is no rule that amici must be totally disinterested," *Funbus Sys., Inc. v. State of Cal. Pub. Utilities Comm'n*, 801 F.2d 1120, 1125 (9th Cir. 1986) (citation omitted); *Hoptowit,* 682 F.2d at 1260 (upholding district court's appointment of amicus curiae, even though amicus entirely supported only one party's arguments).

Here, the California Catholic Conference "is a California non-profit that serves as the official public policy voice of the Catholic Church in California . . . ."  Mot. to File Amicus Curiae at 2.  The Church "offers . . . a unique understanding of the missions Catholic religious bodies serve in California and the ways the policy at issue in this litigation affects them."  *Id.*  The California Catholic Conference has "taken an interest in the policy at issue in this litigation for

years," and previously supported plaintiffs in another case challenging the policy at issue on

different grounds.  *Id.*  The court finds the proposed brief provides helpful context about the

interests animating this dispute.  *See* Brief Amicus Curiae, ECF 122-1.  For example, the

California Catholic Conference explains why, in its view, extending the definition in the statutory

framework exempting "religious employers" from the contraceptive coverage requirement to

abortion care services would infringe on church autonomy.  *Id.* at 13–14 (addressing Cal. Health

& Safety Code § 1367.25(c)(1)(A)–(D)); *NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355

F. Supp. 2d 1061, 1067 (N.D. Cal. 2005) ("District courts frequently welcome amicus briefs from

non-parties concerning legal issues that have potential ramifications beyond the parties directly

involved . . . ." (citation omitted)).

Accordingly, **the motion to file an amicus brief is granted** and the court has considered

the brief in issuing this order.

## II.   STATUTORY AND REGULATORY BACKGROUND

In California, the DMHC and the California Department of Insurance (CDI) regulate the

health care industry.  The DMHC regulates 95 full-service "health care service plans" under the

Knox Keene Health Care Service Plan Act of 1975, Cal. Health & Safety Code §§ 1340 et seq.[3]

The Knox Keene Act defines "health care service plans" as "[a]ny person who undertakes to

arrange for the provision of health care services to subscribers or enrollees, or to pay for or to

reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by

or on behalf of the subscribers or enrollees."  Cal. Health & Safety Code § 1345(f)(1).  Health

maintenance organizations like Anthem, Inc. and Cigna Corp., and other structured managed care

organizations, are "health care service plans" under this definition.  *Rea v. Blue Shield of Cal.*,

226 Cal. App. 4th 1209, 1215 (2014).  These plans serve approximately 27 million people known

as enrollees.[4]

---

[3] *View All Health Plans*, Dep't of Managed Health Care,
https://wpso.dmhc.ca.gov/hpsearch/viewall.aspx (last visited August 17, 2022).

[4] *DMHC Protects Consumers' Health Care Rights*,
https://wpso.dmhc.ca.gov/dashboard/MarketPlace.aspx (last visited August 17, 2022).

1    The Knox Keene Act requires a "person" to secure a license from the Director of the

2    DMHC before offering a health care service plan.  Cal. Health & Safety Code § 1349.  In

3    addition, "[a] health care service plan contract shall provide to subscribers and enrollees . . .  basic

4    health care services . . .."  *Id.* § 1367(i) (citing *id.* § 1345(b)).  The Director is responsible for

5    defining the scope of "basic health care services," including "[p]reventive health services."  *Id.*

6    Drawing on this authority, the Director promulgated regulations defining the scope of "[t]he basic

7    health care services required to be provided by a health care service plan to its enrollees . . .

8    where medically necessary . . .."  Cal. Code Regs. tit. 28, § 1300.67.  The regulations also define

9    "preventive health services" to include "a variety of voluntary family planning services."  *Id.*

10   § 1300.67(f)(2).

11   Looking to both the state Constitution and statutory law, a California Court of Appeal has

12   held that "abortion is one of two possible medically necessary procedures when [a] patient is

13   pregnant," and also that "abortion services are unambiguously included in the statutory categories

14   of basic health care services set forth in [the Knox Keene Act]."  *Missionary Guadalupanas of*

15   *Holy Spirit Inc. v. Rouillard,* 38 Cal. App. 5th 421, 431, 435, 437 (2019), *review denied* (Nov. 20,

16   2019) (internal quotations and citations omitted).

17   The Knox Keene Act includes several categorical and individualized exemptions.  For

18   example, the Act does not apply to plans "directly operated by a bona fide public or private

19   institution of higher learning" or the California Small Group Reinsurance Fund.  Cal. Health &

20   Safety Code § 1343(e) *et seq.*  The Act also permits a "religious employer"[5] to "request a health

---

[5] For the purposes of section 1367.25(c) of the California Health and Safety Code, a "religious employer" is an entity for which each of the following is true:

(A) The inculcation of religious values is the purpose of the entity.

(B) The entity primarily employs persons who share the religious tenets of the entity.

(C) The entity serves primarily persons who share the religious tenets of the entity.

(D) The entity is a nonprofit organization as described in Section 6033(a)(2)(A)i or iii, of the Internal Revenue Code of 1986, as amended.

*See* Cal. Health & Safety Code § 1367.25(c)(1)(A)–(D).

1  care service plan contract without coverage for FDA-approved contraceptive methods that are

2  contrary to [their] religious tenets." *Id.* § 1367.25(c).[6]  Upon the religious employer's request,

3  such "a health care service plan contract shall be provided without coverage for contraceptive

4  methods." *Id.*[7]  Likewise, the Act's provision covering treatment for infertility "shall not be

5  construed to require any employer that is a religious organization," a term the Act does not

6  define, "to offer coverage for forms of treatment of infertility in a manner inconsistent with [their]

7  religious and ethical principles." *Id.* § 1374.55(e).  The terms and conditions for the coverage

8  "may be agreed upon between the group subscriber and the plan." *Id.* § 1374.55(a).

9      Other provisions of the Knox Keene Act allow the Director to allow exemptions to the

10  Act's requirements that apply to "health care service plans and health care service plan contracts

11  as defined in . . . Section 1345."[8]  *Id.* § 1343(a).  The Director "may . . . exempt from [the Act's

---

[6] The statutory language reads as follows and does not clarify who shall provide the requested coverage:

> Notwithstanding any other provision of this section, a religious employer may request a health care service plan contract without coverage for FDA-approved contraceptive methods that are contrary to the religious employer's religious tenets. If so requested, a health care service plan contract shall be provided without coverage for contraceptive methods.

*See* Cal. Health & Safety Code § 1367.25(c).

[7] If in the supplemental briefing on remedies the court orders below the defendant proposes extending the existing contraceptive coverage exemption to abortion care services, defendant shall explain the recourse or mode of appeal available to the Churches and similarly situated employers if a health plan declines to submit a revised plan excluding abortion care services to the defendant.

[8] Section 1345 (f) and (*o*) define, respectively, "health care service plan" and "specialized health care service plan contract" as follows:

> (f) "Health care service plan" or "specialized health care service plan" means either of the following:
>
> (1) Any person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees.
>
> (2) Any person, whether located within or outside of this state, who solicits or contracts with a subscriber or enrollee in this state to pay for or reimburse any part of the cost of, or who

7

1    requirements] any class of persons or plan contracts if the director finds the action to be in the

2    public interest and not detrimental to the protection of subscribers, enrollees, or persons regulated

3    under this chapter, and that the regulation of the persons or plan contracts is not essential to the

4    purposes of this chapter." *Id.* § 1343(b).  Among other rules, the Director "shall by rule define

5    the scope of each basic health service that health care service plans are required to provide as a

6    minimum for licensure." *Id.* § 1367(i).  And "[t]he director may waive any requirement of any

7    rule" for "persons and matters within the director's jurisdiction . . . where in the director's

8    discretion that requirement is not necessary in the public interest or for the protection of the

9    public, subscribers, enrollees, or person or plans subject to this chapter." *Id.* § 1344(a).

10   Similarly, the director "may, for good cause . . . exempt a plan contract or any class of plan

11   contracts" from the requirement to provide "all of the basic health care services" defined in

12   § 1345(b). *Id.* § 1367(i).

13          Generally, plans may seek exemptions from the requirements of the Knox Keene Act for

14   various reasons.  Pls.' Resp. to Def.'s Statement of Undisputed Material Facts (Pls.' Resp. to

15   Def.'s SUMF) ¶ 3, ECF No. 122-1.  One avenue for plans to request an exemption is to "file

16   [with the DMHC] an amendment or a material modification that includes the new language, or a

17   redlined version of the changes that they are seeking to make to the evidence of coverage

18   documents." *Id.* ¶ 2.  The DMHC has between 20 and 30 days to respond to a plan's amendment

19   or material modification request, but the DMHC may postpone a decision indefinitely while it

20   waits for additional information.  Deposition of Nancy Wong (Wong Depo.) at 30:17–33:9, ECF

---

undertakes to arrange or arranges for, the provision of health care services that are to be provided wholly or in part in a foreign country in return for a prepaid or periodic charge paid by or on behalf of the subscriber or enrollee.

. . .

(*o*) "Specialized health care service plan contract" means a contract for health care services in a single specialized area of health care, including dental care, for subscribers or enrollees, or which pays for or which reimburses any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees.

*See* Cal. Health & Safety Code § 1345(f), (*o*).

8

No. 111-8.[9]  Once the DMHC approves revised language in a plan, other plans may adopt or use

that same language.  *Id.* at 147:19–148:8.  However, the DMHC does not have any written rules,

policies, or procedures for requesting an exemption from its abortion coverage requirement, or

explaining what abortion coverage language would be acceptable.  Pls.' Resp. to Def.'s SUMF

¶ 2; *see also* Wong Depo. at 147:13–149:14; *Skyline Wesleyan Church v. Cal. Dep't of Managed*

*Health Care*, 968 F.3d 738, 753 (9th Cir. 2020) (observing DMHC appears to have "no

established procedure" for submitting requests for a discretionary exemption).  Furthermore, the

DMHC interprets the Knox Keene Act to limit its exemption authority to plans, thus proscribing

it from considering or granting requests for exemptions from employers or other enrollees.  Def.'s

Mot. at 23–25.  Likewise, as defense counsel clarified at hearing, if a plan denies an enrollee's

request to seek approval for a contract with a specific abortion care exemption, an enrollee does

not have a right to appeal to the DMHC.[10]

## III.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Foothill Church, Calvary Chapel Chino Hills, and Shepherd of the Hills Church

are all Christian churches who believe that "life begins at the moment of conception."  Def.'s

Resp. to Pls.' SUMF ¶¶ 1–6.  Because the Churches each employ more than 50 full-time

employees, they are required to provide health insurance to their employees.  *Id.* ¶ 12 (citing

declarations).  The Churches "believe and teach that abortion is the intentional destruction of

innocent human life" and their "religious beliefs prohibit . . . abortion under any circumstances,

including in cases involving rape and incest."  *Id.* ¶¶ 7–8 (citing declarations).  Accordingly, their

beliefs bar them from "providing health insurance to their employees that covers elective

abortion."  *Id.* ¶ 13.[11]

---

[9] Citations to depositions refer to the page and line numbers appearing on the reporter's transcript.

[10] At hearing, as confirmed by the court's review of a rough transcript, defense counsel noted that the plans are "free to provide" contracts that cover services "within the confines of what's provided in the existing statutory and regulatory provisions . . .."

[11] The Churches describe the abortions they oppose as "elective."  They do not define that term, and its meaning is unclear in this context, as it requires a subjective judgment of necessity.  For example, it is unclear whose judgment would determine whether the abortion is "elective" and what criteria would be employed in exercising that judgment.  Would an abortion be

1       Prior to 2014, the DMHC had approved several plan contracts that limited or excluded

2   coverage for abortions.  *Id.* ¶ 25 (citing Galus Decl. Ex. 7 at 2–3, ECF No. 111-13; Galus Decl.

3   Ex. 8 at 3, ECF No. 111-14).  These plan contracts covered non-religious and religious

4   employers, including the Churches.  Riess Decl. Ex. V, ECF No. 110-25. While it is unclear what

5   two of the Churches' contracts covered, or if those contracts were consistent with the Churches'

6   religious beliefs, Foothill Church had been in negotiations with its insurance plan to secure

7   coverage consistent with its beliefs when defendant issued the August 2014 letters.  Lewis Decl.

8   ¶¶ 18–20.  Of the nearly 30,000 individuals enrolled in plans with restrictions on abortion care

9   services in 2014, fewer than 1,400 were employed by a "religious employer," as defined under

10  the Knox Keene Act.  Riess Decl. Ex. V at 5.  Similarly, of the 950 people enrolled in an Aetna

11  plan through a religious employer, slightly more than half, 473, were covered by a plan that

12  excluded abortion care services, and none were covered by a plan that limited only in part

13  abortion care services.  Galus Decl. Ex. 6 at 4, ECF No. 111-12.

14      In 2008 and 2010, the DMHC had also approved plan contracts tailored to meet the

15  religious beliefs of two Catholic organizations, Daughters of Charity and St. Joseph Health

---

"elective" if a woman were to seek it on a physician's recommendation, for example?  And for what conditions?  To avoid a risk to her?  If so, what risks qualify?  The meaning of "elective" thus appears to turn on the moral, religious, and personal judgments of the person who uses it. *See also Missionary Guadalupanas*, 38 Cal. App. 5th at 430, 435 (observing that attempting to distinguish between "elective" and "therapeutic" or "medically necessary" abortions is "inconsistent with the Knox-Keene Act and the California Constitution" because abortion is "one of two possible medically necessary procedures when the patient is pregnant").

The word "elective" also carries potentially divisive connotations.  Some might use "elective" to imply that an abortion was obtained without adequate regard for the fact that if the pregnancy is not terminated, a child could be born.  Others might understand "elective" to divide routine care from care for urgent conditions—conditions that, if left untreated, could result in significant changes to one's health or life. It could be that few abortions are "elective" under this definition.

To avoid these ambiguities, the court has adopted the state's terminology, which defines abortions by referring to the patient's circumstances, such as where a pregnant woman "suffers from" a condition "that would, as certified by a physician, place the woman in danger of death unless an abortion is performed," or in the case of a pregnancy resulting from rape or incest. *See* Galus Decl. Ex. 14 at 31.  In using this terminology, the court does not express any view or judgment about the plaintiffs' religious beliefs.  For these reasons, the court uses the term "elective," as well as "therapeutic," and "medically necessary," only when quoting from the record.

1   System.  Def.'s Resp. to Pls.' SUMF ¶ 26 (citing Galus Decl. Exs. 9 & 10) .  These plan contracts

2   only covered abortion when, "due to an existing medical condition, the mother's life would be in

3   jeopardy as a direct result of pregnancy."  *Id*.  The plan contracts did not include coverage for

4   abortion where the pregnancy was a result of rape or incest.  *See* Galus Decl. Exs. 9 & 10.  As

5   confirmed at hearing, the health insurance plans, not the organizations, submitted the plan

6   contracts to DMHC for approval.

7        In October 2013, the DMHC began receiving inquiries from journalists regarding

8   statements from two Catholic universities announcing they would be "eliminating abortion

9   coverage from their employee health plans."  Def.'s Resp. to Pls.' SUMF ¶ 32 (citing Riess Decl.

10  Ex. F, ECF No. 110-9).  A month later, advocacy organizations opposed to the elimination of

11  coverage for abortion care services met with DMHC to discuss their concerns and the Knox

12  Keene Act's coverage requirements, among other issues.  *Id.* ¶ 33 (citing depositions).  DMHC

13  and its parent agency, California Health and Human Services (HHS), exchanged more

14  communications with concerned organizations through the Spring of 2014.  *Id.* ¶¶ 35–37.  In one

15  email communication, HHS thanked Planned Parenthood for providing "legal analysis of the

16  Knox Keene Act and health plan coverage of abortion services," while acknowledging the issue

17  was "complicated and [would] take some time to work through . . .."  Galus Decl. Ex. 17, ECF

18  No. 111-23.  Despite the "complicated" nature of the issue, by August 2014, DMHC had

19  concluded that "religious employers," as defined in the Knox Keene Act, could legally restrict

20  abortion care coverage consistent with their religious beliefs, Def.'s Resp. to Pls.' SUMF ¶ 39,

21  though DMHC did not issue guidance or a public statement to that effect.

22        On August 22, 2014, the DMHC's Director sent the letters noted above to seven private

23  health insurance plans stating that DMHC had reviewed their contracts and "the relevant legal

24  authorities and [ ] concluded that [DMHC] erroneously approved or did not object to" language in

25  some previous plan contracts that "may discriminate against women by limiting or excluding

26  coverage for terminations of pregnancies."  Aug. 22, 2014 Letters at 2.  The letters explained

27  "[e]xclusions and limitations" on abortion are "incompatible with both the California

28  Reproductive Privacy Act and multiple California judicial decisions that have unambiguously

11

1  established under the California Constitution that every pregnant woman has the fundamental

2  right to choose to either bear a child or to have a legal abortion." *Id.*  The "purpose" of the letter

3  was to "remind plans that the [Knox Keene Act] requires the provision of basic health care

4  services and the California Constitution prohibits health plans from discriminating against women

5  who choose to terminate a pregnancy." *Id.*[12]  Accordingly, "all health plans must treat maternity

6  services and legal abortion neutrally," and the DMHC directed plans to "amend current health

7  plan documents to remove discriminatory coverage exclusions and limitations." *Id.* at 2–3.

8      To comply with the letters, the plans could "omit any mention of coverage for abortion

9  services in health plan documents, as abortion is a basic health care service." *Id.* at 3.  The letters

10  noted that "[a]lthough health plans are required to cover legal abortions, no individual health care

11  provider, religiously sponsored health carrier, or health care facility may be required by law or

12  contract in any circumstance to participate in the provision of or payment for a specific service if

13  they object to doing so for reason of conscience or religion." *Id.* at 2.  The letters did not mention

14  the possibility of an exemption for religious employers, i.e., that the DMHC would approve plan

15  contracts that excluded coverage for certain abortion care services.  *See generally, id.*; Def.'s

16  Resp. to Pls.' SUMF ¶ 20.  The plans readily complied with the DMHC's directive.  *Id.* ¶ 21.

17      After learning about the DMHC's letters, the Churches contacted their insurance plans to

18  determine whether religious employers were exempt from the requirement to cover all abortion

19  care services.  Def.'s Resp. to Pls.' SUMF ¶ 45 (citing Rutherford Decl. ¶¶ 20–21; Lewis Decl.

20  ¶¶ 20–21; Hibbs Decl.¶¶ 17–21).  Two plans told one Church they understood DMHC's letter to

21  preclude all exemptions.  *Id.* ¶¶ 47–48 (quoting Hibbs Decl. Ex. 4 (Calvary Church email

22  correspondence regarding abortion benefits with Kaiser and Aetna) at 40–45, ECF No. 111-5).

23  As noted above, the Churches did not contact the DMHC directly regarding the availability of

24  religious exemptions until 2018.[13]  Letter from Plaintiffs' counsel to DMHC at 2.

---

[12]  In 2019, the California Court of Appeal affirmed the DMHC's interpretation of Knox Keene Act's "basic health care services" coverage requirement as covering abortion care. *Missionary Guadalupanas,* 38 Cal. App. 5th at 427.

[13]  The Churches claim their insurers "responded that the DMHC had mandated elective abortion coverage, including for the Churches' healthcare plans, and informed them that there was no religious exemption from the coverage requirement."  Def.'s Resp. to Pls.' SUMF  ¶ 46.

1   Soon after sending the letters, the DMHC also learned of the potential blowback from

2   religious employers opposed to abortion care services.  For example, the Life Legal Defense

3   Foundation, a group opposed to abortion care, claimed the letters violated the federal Hyde-

4   Weldon Amendment.[14]  Galus Decl. Ex. 18 at 2, ECF No. 111-24.  DMHC responded to the

5   Foundation in September 2014, explaining it had "carefully considered all relevant aspects of

6   state and federal law in reaching its position" and would "not reverse its position on the scope of

7   required abortion coverage."  *Id.*  The next month, the Churches filed a complaint for

8   discrimination in violation of Federal Conscience Protections with the Office of Civil Rights of

9   the federal Department of Health and Human Service (HHS OCR). Def.'s Resp. to Pls.' SUMF

10  ¶ 42 (citing Galus Decl. Ex. 19, ECF No. 111-25).  Towards the end of the year, the DMHC also

11  received a letter from the U.S. Commission on Civil Rights alleging DMHC had violated the

12  Weldon Amendment.  *Id.* ¶ 43 (citing Galus Decl. Ex. 20, ECF No. 111-26).

13  Since DMHC issued the letters, at least one plan sought and received an exemption from

14  the requirement to provide abortion care services.  *See generally* Galus Decl. Ex. 14.

15  Specifically, soon after this plan received the August 22, 2014 letter, it sought an exemption for

16  "religious employers" that would "exclude coverage for elective abortion services."  *Id.* at 21.

17  The proposed exception included language describing what abortion care services would be

18  covered and not covered for religious organizations who request excluding benefits for "elective

19  abortions."  *Id.* at 22.  The plan would cover "*medically necessary* therapeutic abortions . . .

20  recommended by a *doctor*," including "to save the life or health of the mother, to prevent harm to

21  the woman's health where indications are that the child will have a significantly increased chance

---

It is unclear from this statement whether the Churches claim the DMHC "informed" the Churches or the insurers "informed" the Churches.  Based on the cited declarations, *see* Rutherford Decl. ¶ 22, Lewis Decl. ¶ 21, Hibbs Decl. ¶¶ 19–21, the court understands the Churches to be claiming the latter, and not to be making any clams about what the DMHC did or did not say to insurers. Plaintiffs' counsel confirmed the court's understanding at hearing.

[14] The Hyde-Weldon Amendment prohibits funds made available in the federal Labor, Health and Human Services, and Education Appropriations Act from being transferred to a state if the state "subjects any institutional or individual health care entity [deferred to include a health insurance plan] to discrimination on the basis that the health care entity does not provide for, pay for, provide coverage of, or refer for abortions."  *See* Section 507(d) of the Consolidated Appropriations Act, Pub. L. No. 113-76, 128 Stat. 5 (Jan. 17, 2014).

1    of premature morbidity or mortality," and "to selectively reduce the number of fetuses to lessen

2    health risks associated with a multiple pregnancy," as well as coverage "for ending of a

3    pregnancy resulting from rape or incest." *Id.* at 22 (emphases in original). Following written

4    correspondence and a phone conversation between the plan's in-house counsel and a DMHC

5    representative in the Office of Plan Licensing, *id.* at 5, 8, 11 & 25, the plan removed all references

6    to "abortion"—along with the terms "elective," "therapeutic," and "medically necessary"—except

7    under a section titled "Medical Care that Is Covered." There, it included this language:

> 8  Benefits include services for abortion that will only be provided if
> 9  the pregnancy is the result of an act of rape or incest or in the case
> 10 where a woman suffers from a physical disorder, physical injury, or
> 11 physical illness, including a life-endangering physical condition
> 12 caused by or arising from the pregnancy itself, that would, as
> 13 certified by a physician, place the woman in danger of death unless
> 14 an abortion is performed.

15  *Id.* at 31. In October 2015, DMHC's Office of Plan Licensing approved the amended plan

16  contract for religious employers, noting it had "no objection" "at this time." *Id.* at 3. The plan

17  contract defined "religious employers" as entities covered not only by California Health and

18  Safety Code section 1367.25(c)(1), but also those religious employers and religious-affiliated

19  employers described in various federal regulations, including 26 C.F.R. § 54.9815–2713A, 29

20  C.F.R. § 2590.715–2713A, and 45 C.F.R. § 147.131. *Id.* at 31. DMHC also included a caveat

21  that the letter did not "constitute a waiver of any compliance issues that may be identified on

22  subsequent review and analysis of the [amended plan contract] . . . ." *Id.* at 3.

23        DMHC's Director later testified she could not recall and was "not involved in the details

24  of" approving this amended plan contract. Galus Decl. Ex. 5 (Rouillard Dep.) at 49:15–50:08,

25  ECF No. 111-11. When asked if she would approve an identical plan contract, but without

26  coverage for abortion in the cases of rape or incest, the Director said she would need to consult

27  with DMHC attorneys in evaluating the plan's request. *Id.* at 52:4–53:14.

28        Around the same time DMHC approved the one plan's amended coverage provisions, the

29  Churches filed the present action, alleging the DMHC's letters violated their rights under the Free

30  Exercise, Establishment, Free Speech, and Equal Protection clauses of the U.S. Constitution.

1    *See* Compl. ¶¶ 104, 114, 119, & 126.  In 2016, this court dismissed the claims, granting the

2    Churches leave to amend their Free Exercise and Equal Protection clause claims.  *Church v.*

3    *Rouillard*, No. 15-2165, 2016 WL 3688422, at *1, 12–13 (E.D. Cal. July 11, 2016).  In 2017, the

4    court again dismissed the remaining two claims, with leave to amend.  *Church v. Rouillard*, No.

5    15-2165, 2017 WL 3839972, at *1 (E.D. Cal. Sept. 1, 2017).

6          In July 2018, after this court had submitted the Director's motion to dismiss the Churches'

7    second amended complaint, the Churches' counsel wrote to the DMHC requesting an exemption

8    for its clients from the Knox Keene Act's abortion-coverage requirement.  Letter from Plaintiffs'

9    counsel to DMHC at 2.  Counsel suggested the DMHC had the authority to exempt the Churches

10   from covering abortions except "when absolutely necessary to save the life of the [pregnant

11   woman]," even in "the very rare and tragic circumstances of rape and incest."  *Id.* at 2–3 (citing

12   Cal. Health & Safety Code §§ 1343(b), 1344(a), and 1367(i)).  California's Deputy Attorney

13   General replied that DMHC "has no regulatory authority or jurisdiction over plan customers,

14   including employers who purchase coverage for their employees," but DMHC would "consider

15   granting" a health plan an exemption if a plan requested one.  Letter from DMHC's counsel to

16   Plaintiffs' counsel at 2–3.  Since DMHC issued its letters, no plan has requested DMHC approve

17   a plan contract that does not cover abortion care services for a woman who becomes pregnant as a

18   result of rape or incest.  Pls.' Resp. to Def.'s SUMF ¶ 9.

19         In 2019, this court granted the State's motion to dismiss the two remaining claims, finding

20   a fourth opportunity for the Churches to plead the claims would be futile.  *Church v. Rouillard*,

21   371 F. Supp. 3d 742, 754 (E.D. Cal. 2019).  The Ninth Circuit affirmed the dismissal of the

22   Establishment Clause claim, *Foothill Church*, 854 F. App'x 174, and remanded the Churches'

23   Free Exercise and Equal Protection claims for further consideration in light of *Fulton*, 141 S. Ct.

24   1868.  *Foothill Church*, 3 F.4th at 1201.

25   **IV.   LEGAL STANDARD**

26         Summary judgment is appropriate if "there is no genuine dispute as to any material fact

27   and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

28   "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

1   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome

2   of the suit under the governing law."  *Id.*

3       The party moving for summary judgment must first show no material fact is in dispute.

4   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  It can do so by showing the record

5   establishes facts beyond genuine dispute, or it can show the adverse party "cannot produce

6   admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The nonmoving must then

7   "establish that there is a genuine issue of material fact."  *Matsushita Elec. Indus. Co. v. Zenith*

8   *Radio Corp.*, 475 U.S. 574, 585 (1986).  Both must cite "particular parts of materials in the

9   record."  Fed. R. Civ. P. 56(c)(1).  The court views the record in the light most favorable to the

10   non-moving party and draws reasonable inferences in that party's favor.  *Matsushita*, 475 U.S. at

11   587–88; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

12       Cross-motions for summary judgment are evaluated separately under the same standard,

13   "giving the nonmoving party in each instance the benefit of all reasonable inferences."  *Am. Civil*

14   *Liberties Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

15   **V.    FREE EXERCISE CLAIM**

16       **A.    Relevant First Amendment Protections**

17       The Free Exercise Clause of the First Amendment, which applies to the states through the

18   Fourteenth Amendment, *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that

19   "Congress shall make no law respecting an establishment of religion, or prohibiting the free

20   exercise thereof," U.S. Const. amend. I.  However, the right to freely exercise one's religion

21   "does not relieve an individual of the obligation to comply with a 'valid and neutral law of

22   general applicability on the ground that the law proscribes (or prescribes) conduct that his religion

23   prescribes (or proscribes).'"  *Emp't Div. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *United*

24   *States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in the judgment)).  A law is

25   not generally applicable if it "'invite[s]' the government to consider the particular reasons for a

26   person's conduct by providing 'a mechanism for individualized exemptions.'"  *Fulton*, 141 S. Ct.

27   at 1877  (quoting *Smith*, 494 U.S. at 884).  Nor is it generally applicable if it includes "a formal

28   system of entirely discretionary exceptions . . . ."  *Id.* at 1878.  Such a mechanism or formal

16

1   system might include a "good cause" standard permitting the government to grant exemptions,

2   *Smith*, 494 U.S. at 884, or a provision in the law allowing exceptions at the "sole discretion" of a

3   government agent, *Fulton*, 141 S. Ct. at 1878.

4          A valid and neutral law of general applicability must be upheld if it is rationally related to

5   a legitimate governmental purpose.  *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075–76, 1084

6   (9th Cir. 2015).  In contrast, laws that are not neutral or are not generally applicable are subject to

7   strict scrutiny.  *Id.* at 1076.  Under strict scrutiny, laws "must be justified by a compelling

8   governmental interest and must be narrowly tailored to advance that interest."  *Church of Lukumi*

9   *Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993).

10         **B.     The Challenged Policy and How to Evaluate that Policy**

11         Both parties agree the Director may "for good cause" exempt a plan or plan contract from

12  the requirement to provide "basic health care services," *see* Cal. Health and Safety Code §

13  1367(i), and she may "waive any requirement of any rule or form where in [her] discretion that

14  requirement is not necessary," *id.* § 1344(a).  However, the parties disagree about which policy or

15  action this court is reviewing.  The Churches argue "the mere '*creation* of a formal mechanism

16  for granting exceptions renders a policy not generally applicable, regardless of whether any

17  exceptions have been given,'" Pls.' MSJ at 15 (quoting *Fulton*, 141 S. Ct. at 1879 (emphasis

18  added)), and thus challenge the "State's decision to enforce the Abortion Coverage Requirement

19  against the Churches' healthcare plans in the first place."  Pls.' Reply at 7; *see also* Pls.' Opp'n at

20  5.  The Director argues the Churches are challenging her refusal to "extend an exemption to

21  [p]laintiffs because they are not entities subject to regulation by DMHC under the [Knox Keene

22  Act]."  Def.'s Opp'n at 10–11.  In other words, the Churches argue the Director would not extend

23  a religious exemption to them, while the Director claims she did not because could not.[15]

---

[15] The Director, through the Attorney General of California, only refused to extend an
exemption to the Churches in July 2018, after this court had submitted the Director's third and
final motion to dismiss.  *See* ECF No. 80; Letter from DMHC's counsel to Plaintiffs' counsel at
2–3.  Given that this court's subsequent 2019 decision not to apply strict scrutiny to the Director's
actions hinged on the Churches' not alleging "that any plan that would be acceptable to them has
been submitted to defendant for approval, nor that she has rejected any such plan," it is possible
to imagine a different prior outcome had the Churches requested an exemption sooner, or asked a

1   Nonetheless, as the court was careful to confirm at the hearing, the Director now concedes

2   that the existence of a "system of individual exemptions" in the Knox Keene Act subjects her

3   decision not to expand the plan exemption framework to the Churches to strict scrutiny. *Fulton*,

4   141 S. Ct. at 1877; Def.'s MSJ at 17–18.[16]   Accordingly, the court must decide whether this

5   policy "advances 'interests of the highest order' and is narrowly tailored to achieve those

6   interests." *Fulton*, 141 S. Ct. at 1881 (quoting *Lukumi*, 508 U.S. at 546).   The court now turns to

7   these questions.

8   **C.      Whether the Policy is Narrowly Tailored to Serve Compelling Interests**

9   The Director explains her decision not to make an exception at the Churches' request by

10   citing her policy not to entertain requests for exceptions unless they come from a plan.   She cites

11   three compelling government interests.   Def.'s MSJ at 18.   First, the policy prevents "a flood of

12   exemption requests from over 26 million enrollees" who may object to their plan's covered care

13   services.   *Id.*   Second, it prevents "significant third-party harm to enrollees," which may occur if

14   employers opt out of legally mandated healthcare coverage.   *Id.* at 18–19.   Third, it appropriately

15   restricts DMHC's jurisdiction as authorized by the California State Legislature.   *Id.* at 19.   None

16   of these interests are sufficiently compelling, nor is the department's rigid approach narrowly

17   tailored.   *Lukumi*, 508 U.S. at 531–32.

18   As the Supreme Court reiterated in *Fulton*, the First Amendment requires courts to

19   "scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants."

---

plan to submit for approval a product that comported with their religious beliefs. *Church*, 371 F. Supp. 3d at 752–53.

[16] Because the director concedes strict scrutiny applies, the court applies it without deciding whether it is the appropriate standard to apply.   However, the court observes that *Fulton* and its predecessors do not address whether a decision by a government agency with discretion to extend exemptions to regulated entities is subject to strict scrutiny if the agency declines to extend an exemption directly to non-regulated religious claimants burdened by a requirement imposed on those regulated entities.   In other words, if an agency entertains exemption requests from the regulated entities, some of which are submitted on behalf of religious entities, must it also absent a compelling reason entertain exemption requests directly from those non-regulated religious entities?   Likewise, does the existence of a system of individualized exemptions for regulated entities mean a requirement is not generally applicable as to any non-regulated religious claimant with standing?

1    141 S. Ct. at 1881 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546

2    U.S. 418, 431 (2006)).  "The question, then, is not whether the [defendant] has a compelling

3    interest in enforcing its [challenged] policies generally, but whether it has such an interest in

4    denying an exception to [plaintiff]." *Id.*

5           The State's first two interests, both of which are couched in problems that "may" arise, are

6    speculative and thus "insufficient to satisfy strict scrutiny." *Id.* at 1882.  First, the possibility that

7    enrollees may begin objecting en masse to their plans if the Director grants an exemption to the

8    Churches is "conjecture" and unsubstantiated by anything in the record. *Ramirez v. Collier*, 142

9    S. Ct. 1264, 1280 (2022) (rejecting argument that "comes down to conjecture regarding what a

10   hypothetical [person] might do in some future case").  As noted above, this court must consider

11   the harm of granting "specific exemptions" to "particular religious claimants," in this case the

12   Churches. *Fulton,* 141 S. Ct. at 1881.  The cases the Director cites all arose outside of California

13   and concerned entirely different policies. *See* Def.'s MSJ at 19–20 (listing cases).  Even

14   assuming similar religious challenges materialized in California in large numbers, the Director

15   has not offered evidence showing that entertaining these religious objections would be so difficult

16   and time-consuming that "DMHC's operations would grind to a halt . . . ." *Id.* at 20.  The DMHC

17   could reject outlandish requests on their merits and limit requests to those from employers like the

18   Churches, rather than individuals.  Finally, if the DMHC receives and approves an exemption

19   request from a religious claimant, the DMHC can ensure the claimant's plan is "at the table," *id.*

20   at 21, by including the plan on communications and requesting the plan submit a revised evidence

21   of coverage document that includes the approved exemption.

22          Second, the State can avoid harms to third parties and still consider requests from entities

23   other than plans.  As the Churches point out, "all the Churches' employees share their religious

24   beliefs about abortion, so the State's interest in withholding an exemption *from the Churches*

25   cannot be compelling." Pls.' Opp'n at 18 (emphasis in original).  Accordingly, the Director may

26   limit religious exemptions to "particular" employers who provide coverage to employees who

27   share their religious beliefs. *Fulton,* 141 S. Ct. at 1881.

1      The Director's third interest, complying with state law limiting her jurisdiction, is

2   legitimate but could be accommodated without burdening the Churches' religious exercise.  For

3   the sake of argument, the court assumes without deciding that the Director's understanding of the

4   scope of her regulatory authority, that she is limited to regulating health plans, is correct.

5   Nonetheless, nothing in the statutory text explicitly precludes her from fielding requests for

6   exemptions from religious claimants.  Likewise, nothing appears to preclude the Director from

7   directing the religious claimant's plan to submit a revised evidence of coverage document

8   comporting with the religious claimant's belief to the DMHC for approval.  The Director's

9   authority to give orders to a plan does not foreclose the authority to consider requests for those

10   orders from others.  In the end, the Director is still regulating the plan.

11      In sum, the Director has not shown "[she] lacks other means of achieving [her] desired

12   goal without imposing a substantial burden on the exercise of religion by [plaintiffs]."  *Burwell v.*

13   *Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014).  The Director's denial of the Churches'

14   request for exceptions to accommodate their religious beliefs, based solely on the fact that those

15   requests did not originate with a plan, was not narrowly tailored to serve a compelling interest.

16      Plaintiffs' motion for summary judgment on their Free Exercise Clause claim is granted,

17   and the defendant's motion is denied.

18   **VI.   EQUAL PROTECTION CLAIM**

19      The Equal Protection Clause of the Fourteenth Amendment prohibits a state from

20   "deny[ing] to any person within its jurisdiction the equal protection of the law," U.S. Const.

21   amend. XIV, which essentially "direct[s] that all persons similarly situated should be treated

22   alike," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citations omitted).  A

23   viable Equal Protection claim must also "show that the defendants acted with an intent or purpose

24   to discriminate against the plaintiff based upon membership in a protected class." *Barren v.*

25   *Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (citing *Washington v. Davis*, 426 U.S. 229, 239-

26   40 (1976)).  Determining discriminatory intent "demands a sensitive inquiry into such

27   circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v.*

28   *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  Still, "[d]iscriminatory purpose . . . implies

20

1    more than intent as volition or intent as awareness of consequences. . . . It implies that the

2    decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of,

3    not merely in spite of, its adverse effects upon an identifiable group." *Pers. Adm'r of*

4    *Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (internal citation and quotations omitted).

5           This court previously dismissed the Churches' Equal Protection Clause claim for two

6    reasons. *See Church*, 371 F. Supp. 3d at 753.  First, the Churches did not allege facts giving rise

7    to a reasonable inference that the Director treated them differently than "similarly situated"

8    persons and businesses.  *Id*.  The court noted "the challenged letters apply to [p]lans, not

9    purchasers, and do not make any classification with respect to purchasers." *Id*.  Second, the

10   Churches did not allege facts showing that defendant acted "at least in part because of, not merely

11   in spite of," plaintiffs' religious beliefs.  *Id*. (quoting *Pers. Adm'r of Massachusetts*, 442 U.S. at

12   279).

13          The court declines to revisit these decisions.  The Churches have not alleged facts or

14   produced evidence showing defendant acted with discriminatory intent.  It is undisputed that the

15   Director would have considered the Churches' requests if they had come from a plan.  Defs.'

16   Reply at 5.  The court can also grant the Churches appropriate relief solely on the basis of their

17   free exercise claim.

18          The Director's motion for summary judgment of the equal protection claim is granted, and

19   the Churches' motion is denied.

20   **VII.   CHURCH AUTONOMY DOCTRINE**

21          The Churches and amicus curiae also argue that the abortion coverage requirements

22   interfere with the First Amendment's protections for church autonomy.  *See* Pls.' MSJ at 20–21;

23   Brief Amicus Curiae at 11–15.  The court need not reach this issue, as the relief granted would be

24   the same.  *See INS v. Bagamasbad*, 429 U.S. 24, 25 (1976) ("As a general rule courts and

25   agencies are not required to make findings on issues the decision of which is unnecessary to the

26   results they reach.").

1 | **VIII. CONCLUSION**

2 |     The court **grants** the motion for leave to file an amicus brief; the brief is deemed filed.

3 | The court **grants in part plaintiffs' motion for summary judgment, as to their free exercise**

4 | **claim.**  Plaintiffs' motion is otherwise **denied.**  The court **grants in part defendant's motion for**

5 | **summary judgment, as to plaintiffs' Equal Protection Act claim**.  The motion is otherwise

6 | **denied**.

7 |     No later than 30 days after the entry of this order, the parties are directed to file

8 | supplemental briefing no longer than 15 pages each on the remedies and scope of injunctive relief

9 | sought.  Any responsive briefs the parties wish to file are due 14 days thereafter.

10 |     This order resolves ECF Nos. 110, 111 and 112.

11 | IT IS SO ORDERED.

12 | DATED:  August 24, 2002.

CHIEF UNITED STATES DISTRICT JUDGE

22